COLUMBIA SAVINGS, Petitioner,

v.

Pearl ZELINGER, Respondent.

No. 88SC551.

Supreme Court of Colorado,
En Banc.

June 25, 1990.

Silverman and Gelman, P.C., Scott Gelman, Denver, for petitioner.

Podoll & Podoll, P.C., Richard B. Podoll, Robert A. Kitsmiller, Denver, for respondent.

Justice ROVIRA delivered the Opinion of the Court.

We granted certiorari to consider whether the court of appeals erred in concluding, contrary to detailed findings of fact of the trial court, that the petitioner, Columbia Savings (Columbia), could not set-off a portion of the proceeds of a trust account in

which the respondent, Pearl Zelinger, had a beneficial interest, because the debt which formed the basis of the set-off had been discharged pursuant to section 4-3-605, 2 C.R.S. (1982). We reverse.

## I

Zelinger and her sister, Gloria Springer, were named as beneficiaries of a revocable trust account established at Columbia by their mother, Clara Hayutin. The trust fund was established on September 30, 1977, and consisted of a certificate of deposit (CD) with a principal balance of $85,000. This CD matured on September 30, 1983, and was subject to an early withdrawal penalty.

On September 10, 1982, Hayutin obtained a "savings account"[1] loan of $15,000 from Columbia. She signed a promissory note and collateral agreement which pledged the funds in the CD as collateral. This loan was due on the maturity date of her CD. The loan provisions contained an acceleration clause, which provided that the loan would become due at the time of Hayutin's death if it occurred prior to the maturity of the CD. Columbia then placed a "hold" on the funds in the CD equal to the $15,000 loan, plus the interest which would accrue over the term of the loan.

On March 8, 1983, Hayutin borrowed an additional $15,000. In connection with this transaction, she signed a second promissory note for $31,608, which consisted of the previous $15,000 loan, the current $15,000 advance, and the interest accrued thereon. A hold was then placed on the funds in her CD equal to the new loan balance of $30,000, plus accrued interest. In accordance with Columbia's loan procedures, the first note executed on September 10, 1982, was marked "paid" and returned to Hayutin.

A third loan for $35,000 was made by Columbia on March 11, 1983. This loan, however, was made to Springer, who received the proceeds. Apparently, bank personnel misinterpreted a power of attorney given to Springer by Hayutin and erroneously allowed her to pledge her mother's CD funds as collateral for the loan.

In connection with this transaction, Springer signed a promissory note for $68,484.18. This note balance represented the total of: Hayutin's two advances of $15,000 each, the current advance of $35,000 received by Springer, and the interest accrued on these loans. As with the previous transactions, a "hold" was placed on Hayutin's CD in an amount equal to the total loan balance of $65,000, plus the accrued interest. Similarly, the previous note, signed by Hayutin on March 8, 1983, was marked "paid" and returned to Hayutin.

On August 8, 1983, Springer borrowed an additional $12,000 from Columbia by pledging additional funds from Hayutin's CD as collateral. Columbia contends that this transaction also resulted from the erroneous conclusion by bank personnel that the power of attorney gave Springer the authority to borrow against the funds contained in her mother's account.

A new promissory note was signed by Springer for $78,201.94. This amount consisted of the previous loans of $65,000, the current advance of $12,000, and the interest accrued on these advances. Columbia, as it had done in connection with the previous transactions, placed a "hold" on the CD funds equal to the $77,000 in total advances, plus accrued interest. Similarly, the previous promissory note for $65,000 was marked "paid by extension" and returned to Hayutin.

Hayutin died on September 18, 1983, approximately two weeks prior to the maturity of the CD. Columbia then set-off the $77,000 loan balance and the accrued interest with the CD proceeds.

Pursuant to the trust agreement, Zelinger is entitled to half of the fund proceeds. When she attempted to collect her share of the CD funds, she was informed of Columbia's set-off. Zelinger then brought this action challenging the set-off.

Prior to trial, Columbia admitted that the power of attorney given Springer by her mother did not authorize her to pledge her

---

1. This "savings account" loan allows bank customers to, in effect, withdraw a portion of their CD funds prior to maturity without incurring an early withdrawal penalty.

mother's CD funds as collateral for her loan. Accordingly, Columbia confessed judgement on all but the $30,000 loan obtained directly by Hayutin. It claims that Springer's subsequent borrowing did not discharge Hayutin.

The trial court conducted an evidentiary hearing to determine the intent of the parties. It found that:

> [I]n order to resolve the issue, the court has to look at this series of transactions as a whole rather than to isolate the first note or the second note and to scrutinize one single note. In doing so, it's quite evident to the court that the parties contemplated an ongoing, varying, unpaid loan balance, evidenced on the one hand by the bank's records as reflected in the vouchers attached to each of the four checks, and the borrower's acquiescence in receiving as loan proceeds only the mathematical difference between the prior loan balance and the current promissory note.

The trial court concluded that through the "savings account" loans both Columbia and Hayutin intended to reduce her CD account balance by the $30,000 set-off amount.

In reversing, the court of appeals held that "it is undisputed that Hayutin's note was marked 'paid' and returned to her. Thus, Columbia discharged Hayutin and had no right of set-off." *Zelinger v. Columbia Savings & Loan*, 768 P.2d 744, 745 (Colo.App.1988). The court of appeals found that Springer's note was not a renewal of Hayutin's note and that:

> Contrary to the trial court's statement, Hayutin's intent was not clear, as no evidence was presented on her intent. Moreover, Columbia's conduct contradicted any intent to hold Hayutin liable. Columbia has shown nothing more than a unilateral mistake in accepting Springer's personal note.... Therefore, we find no support for the trial court's findings as to the parties' intent.

*Id.* at 745.

## II

■ We first consider the parties' contentions regarding the burden of proof in these proceedings. Columbia argues that because Zelinger, in effect, is asserting that its set-off was wrongful, she has the burden of showing that Hayutin's notes were discharged. Zelinger contends, however, that even if she initially had the burden of proof, her production of Hayutin's promissory notes, which were marked "paid" by the bank and surrendered to Hayutin, created a presumption of discharge. We agree.

■ Generally, discharge is raised as an affirmative defense by the debtor who bears the burden of proving this assertion. Possession of the instrument by the debtor, however, is normally sufficient to create a rebuttable presumption of discharge. *See Carraher v. Felix*, 534 P.2d 323, 325 (Colo. App.1975); *Vicon Construction Co. v. Pontoriero*, 27 UCC Rep.Serv. 150 (D.N.J. 1979).

■ Here, the claim of discharge is implicit in Zelinger's claim to the trust account funds. Even though the discharge issue was not raised as an affirmative defense in this case, we conclude that principles governing a "typical" discharge situation are equally applicable here. In either situation, when the debtor is in possession of the instrument, the party attempting to enforce the agreement must:

> [O]vercome a presumption that the instrument was discharged. Proof of the fact that the debtor never satisfied the underlying obligation, evidence that after the alleged cancellation the parties believed the obligation still existed, or even a credible denial by the creditor of intent to cancel the instrument can suffice to meet this burden.

J. White & R. Summers, *Uniform Commercial Code* § 13–22 at 684 (3d ed. 1988).

## III

■ Columbia contends that a mistake was made by bank personnel and that it did not intend to discharge Hayutin. It asserts that Springer's loans involved "roll-over" type transactions because the outstanding

loan balances were never actually paid. Zelinger argues, however, that Columbia's intent is not relevant to the discharge issue. She contends that pursuant to section 4–3–605, 2 C.R.S. (1973), Columbia discharged Hayutin, as a matter of law, by marking her notes "paid" and surrendering them to her.

Section 4–3–605, 2 C.R.S. (1973), is identical to article 3, section 605 of the Uniform Commercial Code, which provides that:

(1) The holder of an instrument may even without consideration discharge any party:

(a) In any manner apparent on the face of the instrument or the indorsement, as by intentionally canceling the instrument or the party's signature by destruction or mutilation, or by striking out the party's signature; or

(b) By renouncing his rights by a writing signed and delivered or by surrender of the instrument to the party to be discharged.

This provision was considered by the court of appeals in *Ohio Casualty Insurance Co. v. Yaklich*, 768 P.2d 1274, 1275 (Colo.App.1989), in which the court held that:

Despite the language of § 4–3–605, a cancellation or renunciation has no effect when made by a person without authority from the holder. The same is true if cancellation or renunciation is made unintentionally or by mistake.

(Citations omitted.)

The holding in *Yaklich* is consistent with the conclusions reached by other jurisdictions which have addressed this issue. These courts have required that an intent to discharge a party be present, and have concluded that such an intent is "not the equivalent of a clerk's personally stamping a note 'canceled' or 'paid' when, in fact, it has not been paid." *Richardson v. First Nat'l Bank of Louisville*, 660 S.W.2d 678, 679 (Ky.App.1983). The determination of the intent of the parties involves a question of fact. *See Guaranty Bank & Trust Co. v. Dowling*, 4 Conn.App. 376, 494 A.2d 1216, 1219 (1985); *First Galesburg Nat'l Bank & Trust Co. v. Martin*, 58 Ill.App.3d

113, 373 N.E.2d 1075 (1978); *Martin v. Martin*, 755 S.W.2d 793 (Tenn.App.1988).

In *Guaranty Bank & Trust v. Dowling*, the court considered a situation in which a lender mistakenly marked a note "paid in full." The court noted that the term:

'[M]istake' is not readily susceptible of general definition. To the extent that a comprehensive definition of the term can be fashioned, it has been said that it 'signifies an erroneous mental conception which influences a person to act or to omit to act. Whether the plaintiff, in marking the note 'paid in full' and returning it to the maker, did so on the basis of such an erroneous conception is a question of mental state or intent. Intent is a question of fact, and the trial court's conclusion in that regard, if not clearly erroneous, will not be disturbed.

4 Conn.App. 376 at 379–80, 494 A.2d 1216 at 1219 (citations omitted).

Consideration of the intent of the parties also furthers important equitable considerations. For example, in *Hubbard Realty Co. v. First National Bank of Pikeville*, 704 F.2d 733, 736 (4th Cir.1983), the court found that there was a "compelling inference that the parties—particularly the bank—could not have intended such a draconian consequence [discharge] given the undisputed fact that the obligation had never been actually satisfied." The court noted that the debtor had offered only the most meager of evidence in support of a contrary inference. The intent of the parties has also been considered when the lender has acted negligently, in order to prevent the debtor from gaining a benefit to which he was not entitled. *See Guaranty Bank & Trust Co. v. Dowling*, 4 Conn. App. 376, 494 A.2d 1216 (1985).

In support of her argument that the intent of the parties should not be considered, Zelinger relies on *J.J. Schaefer Livestock Hauling, Inc. v. Gretna State Bank*, 229 Neb. 580, 428 N.W.2d 185 (1988); and *Peterson v. Crown Financial Corp.*, 661 F.2d 287 (3d Cir.1981). Neither of these cases, however, is persuasive.

In *J.J. Schaefer Livestock Hauling, Inc. v. Gretna State Bank,* 229 Neb. 580, 428 N.W.2d 185 (1988), neither party claimed that mistake or fraud was involved. In *Peterson v. Crown Financial Corp.,* 661 F.2d 287 (3d Cir.1981), the court considered a situation in which a renewal note failed to incorporate a disputed interest balance which the bank claimed had accrued on the first note. The court acknowledged that the debtor was "correct in asserting that the question of whether a renewal note operates as a discharge of the original note depends on the intention of the parties." *Id.* at 291. It found, however, that under the facts of the case the omission of the disputed interest balance in the renewal note relieved the borrower of liability as to the disputed amount as a matter of law.

■ Zelinger also asserts that even if the intent of the parties may be considered under subsection (1)(b) of section 4–3–605(1)(a), 2 C.R.S. (1973), subsection (1)(b), by its terms, provides that the surrender of a promissory note is all that is required for discharge. This argument, however, has been rejected by numerous courts which have interpreted this section as also requiring an intent by the parties to discharge the debtor. *See Hubbard Realty Co. v. First Nat'l Bank of Pikeville,* 704 F.2d 733 (4th Cir.1983) (intent of parties considered where note marked "paid" and surrendered to borrower). *See also Mid–Eastern Elecs., Inc. v. First Nat'l Bank of S. Maryland,* 455 F.2d 141, 145 (4th Cir.1970); *Pentagon Fed. Credit Union v. Edwards,* 571 S.W.2d 679 (Mo.App.1978); *Peoples Bank of South Carolina, Inc. v. Robinson,* 272 S.C. 155, 249 S.E.2d 784 (1978). In *Robinson,* the court noted that:

> Commentators on the Uniform Commercial Code conclude that the courts '... have glossed this section by requiring that surrender of the instrument be accompanied by an intent to discharge the party.' J. White, R. Summers, *Uniform Commercial Code* at 447 (1972).

249 S.E.2d 784 at 785.

Under the circumstances presented here, we conclude that the trial court properly considered the intent of the parties in its analysis of the provisions of section 4–3–605(1), 2 C.R.S. (1973). Having reached this conclusion, we now consider the evidentiary issues raised by Zelinger.

## IV

### A

■ Zelinger contends that Columbia did not present competent evidence regarding the intent of the parties. Marlene Hogan, a senior vice-president of Columbia responsible for branch operations, was the only witness called by Columbia. Zelinger argues that although Hogan was familiar with Columbia's policies and procedures, she was not competent to testify regarding the parties' intentions, because she did not have personal knowledge of the transactions in question. We disagree.

CRE 406 provides that:

> Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice.

■ Pursuant to this rule, evidence of an organization's practice or routine may be admitted as circumstantial evidence that, on the occasion in question, an act was done in conformity with the ordinary practice. Such evidence may be considered even when the person who engaged in the routine practices is unavailable to testify. J. Weinstein & M. Berger, 2 *Weinstein's Evidence* § 406(03) (1989). This procedure recognizes that:

> As a practical matter large organizations cannot exist unless much of their work is routinized. If reliance could not be placed on this routine much of the predicate for business entries would be lost. So many events involving changing staff occur that reliance on routine to prove that events occurred in a certain way is essential.

*Id.* at 406–10.

Here, testimony regarding Columbia's policies and procedures was properly admit-

ted as circumstantial evidence that it acted in conformity with its procedures on the occasions in question. Similarly, records created by Columbia and relevant to the transactions in question were also properly admitted by the trial court pursuant to CRE 803(6).[2] Hogan, based upon her knowledge of the bank's operations, was qualified to testify as to the significance of these records.

## B

Zelinger also claims that Columbia failed to present sufficient evidence to support the trial court's conclusion that the parties did not intend to discharge Hayutin.

At trial, Hogan testified as to the bank's loan procedures and explained the significance of the documents created in connection with these loans. She testified that it was the bank's policy to advance funds on this type of loan only to the extent that the debtor's funds deposited at the bank were sufficient to fully collateralize the loan.

Hogan also testified that the loan vouchers indicated that none of the loan advances had been repaid. She stated that if any of the loan proceeds had been repaid, there would have been an entry reflecting this in the bank's records and that no such entry had been made.[3]

The bank's procedures regarding the creation, filing, and return of promissory notes executed in connection with this type of transaction were also reviewed by Hogan. She testified that when a customer obtains multiple loan advances, it is Columbia's policy to keep only the customer's most recent promissory note, which lists the current loan balance, in the customer's file.[4] When multiple advances were involved, it is the bank's policy to mark the

superseded note "paid" and surrender it to the debtor. She testified that superseded notes were marked "paid"[5] regardless of whether the note had been rolled-over into a new note or actually paid off.

Hogan testified that bank policy provided that only the owner of funds, or attorney in fact for the owner, was allowed to pledge funds as collateral. Finally, she testified that the funds advanced to Springer were the result of a mistake made by bank personnel in their interpretation of Springer's authority pursuant to the power of attorney given her by Hayutin.

The weight to be given Hogan's testimony is for the finder of fact to determine based upon the particular circumstances of the case. Evidence of routine practices "does not stand in a special light nor is it to be referred to a second-class category which automatically carries little weight." *Meyer v. United States*, 638 F.2d 155, 158 (10th Cir.1980). The probative value to be given the documentary evidence was also for the finder of fact to determine. *Crompton–Richmond Co. v. Briggs*, 560 F.2d 1195, 1202 n. 12 (5th Cir.1977) (weight to be given business records for trier of fact to determine).

In *Bloskas v. Murray*, 646 P.2d 907, 911 (Colo.1982), we found that although a doctor had no recollection that a pre-operative warning was given prior to the operation in question, evidence of his routine practice provided circumstantial evidence that he acted consistently with this practice on the occasion at issue, and was sufficient to create a question of fact. *See also Meyer v. United States*, 638 F.2d 155, 158 (10th Cir.1980) (admission of evidence of dentist's practice of warning patients of operative risks created a question of fact).

---

**2.** Further, all but one document was admitted pursuant to a stipulation of the parties. The only document for which an objection to admissibility was raised involved handwritten entries on the cover of Hayutin's customer file. This issue was not appealed.

**3.** Evidence of an absence of an entry was properly admitted pursuant to CRE 803(7).

**4.** She testified that this practice furthered Columbia's internal auditing practices by enabling

bank personnel to easily confirm that the loan balance recorded in the accounting records equaled the balance shown on the promissory note contained in the customer's file.

**5.** Hogan testified that it was customary to mark notes that had been rolled-over as either "paid" or "paid by extension." She stated that these notations were used synonymously by bank personnel in a roll-over transaction.

We conclude that Hogan's testimony, along with the documentary evidence, provided an adequate basis for the trial court to conclude that the parties intended to create an ongoing lending relationship in which Hayutin would remain personally liable. There was also competent evidence supporting the trial court's conclusion that the parties did not intend to discharge Hayutin. Finally, the trial court's conclusion that Hayutin's loan had not been repaid is supported by substantial evidence.

Accordingly, the judgment of the court of appeals is reversed.