**CITY OF GRAND JUNCTION,**
**Petitioner/Cross–**
**Respondent,**

v.

**UTE WATER CONSERVANCY**
**DISTRICT, Respondent/Cross–**
**Petitioner.**

**No. 93SC745.**

Supreme Court of Colorado,
En Banc.

June 30, 1995.

Daniel E. Wilson, City Atty., City of Grand Junction, John P. Shaver, Asst. City Atty., Grand Junction, Grimshaw & Harring, P.C., Wayne B. Schroeder, Ronald L. Fano, Peter J. Whitmore, Denver, for petitioner/cross-respondent.

Williams, Turner & Holmes, P.C., Mark A. Hermundstad, William D. Prakken, Grand Junction, for respondent/cross-petitioner.

Geoffrey T. Wilson, Gen. Counsel, Colorado Municipal League, Denver, for amicus curiae Colorado Municipal League.

Justice LOHR delivered the Opinion of the Court.

The issues in this case arise out of a dispute between the Ute Water Conservancy District (District) and the City of Grand Junction (City) as to which entity has the authority to provide water to domestic water users in areas where the boundaries of the City and the District overlap. The primary issue in this case is whether a bond—originally issued by the District to the Farmers Home Administration (FmHA), an agency of the United States Department of Agriculture, and subsequently reacquired by the District—satisfies the outstanding debt requirement of the applicable federal statute, 7 U.S.C. § 1926(b) (1994). If the bond is still outstanding, section 1926(b) protects the District from competition and prevents the City from supplying water to domestic water users in the overlap areas, except to those domestic water consumers historically served by the City.

In a declaratory judgment action brought by the District, the Mesa County District Court held that the bond remained outstanding, with the result that the District is protected from competition by the City in the overlap areas pursuant to section 1926(b). The district court rejected the District's alternative argument that it is a "municipality" for purposes of section 31–35–402(1)(b), 12B C.R.S. (1986), and therefore enjoys protection from competition by the City under that statute. On appeal, the Colorado Court of Appeals affirmed the trial court's judgment for the District based on section 1926(b) and vacated the trial court's ruling on the section 31–35–402(1)(b) issue as premature. *Ute Water Conservancy Dist. v. City of Grand Junction*, 870 P.2d 593 (Colo.App.1993). We granted certiorari to review the correctness of the court of appeals' resolution of those issues [1] and now affirm the judgment of the court of appeals.

1. The City sought review of the § 1926(b) determination, and the District cross-petitioned for

## I.

The District, a water conservancy district that is a political subdivision of the State of Colorado, was created by decree of the District Court of Mesa County in 1956 in order to provide water service to domestic water users in an area surrounding the City.[2] *See* the Water Conservancy Act, §§ 37–45–101 to –153, 15 C.R.S. (1990 & 1994 Supp.) (providing for the creation and operation of water conservancy districts). Prior to the creation of the District, it was difficult for people in rural areas of Mesa County to obtain domestic water service. These people were forced to haul their water in tanks and store it in cisterns. Other rural residents who lived closer to the City were able to receive water from the City's system, but it was expensive and the service was inadequate. A group of residents who lived outside the City organized and created a water conservancy district in order to provide domestic water service in areas where service was lacking or deficient. The District first provided water service in 1964.

When the District was created in 1956, it surrounded the City but it did not overlap the City's boundaries. As the City expanded, however, the City annexed certain areas served by the District. We refer to these areas within the geographic boundaries of both the District and the City as "overlap areas." In order to resolve conflicts as to which entity would provide water to consumers in overlap areas, the District and the City entered into two written agreements, in 1967 and 1976.[3] These agreements, however, failed to resolve the continuing disputes between the District and the City. Except for historical City service areas, the District has provided water to all new consumers in the overlap areas since 1967.

In order to keep pace with rapid growth, the District made various improvements to its system, and financed them through borrowings including loans evidenced and secured by the issuance of revenue bonds. In 1981, the district issued one such revenue bond, in the original principal amount of $3 million, to the FmHA.[4] The bond matures in 2021. The District subsequently conducted two transactions involving this 1981 revenue bond that form the basis of the City's contention that the obligation of the District on the bond has been discharged.

First, in 1983, the District refinanced the 1981 revenue bond through a transaction referred to as an "advance refunding"—whereby new bonds were sold and the proceeds of these new bonds were deposited in an escrow account and were used to pay the installments of principal and interest on the 1981

---

review of the ruling concerning § 31–35–402(1)(b). We granted certiorari on the following issues:

*Issues raised by petitioner City:*

1. Whether the defeasance, payment, cancellation of indebtedness and purchase of a bond by its issuer, result in the discharge of the "underlying debt" to the bondholder, even though the purchase of the bond was structured by the issuer with the intent to preserve the "underlying indebtedness" to the bondholder.

2. Whether the protection of 7 U.S.C. § 1926(b) (1994) extends to a district which has purchased, paid and canceled its indebtedness on a defeased bond to Farmers Home Administration in a transaction structured by the District with the intent to preserve the "underlying indebtedness" to FmHA.

3. Whether the application of 7 U.S.C. § 1926(b) under the facts of this case violates the Tenth Amendment to the United States Constitution.

*Issues raised by cross-petitioner District:*

4. Whether the District is a "municipality" for purposes of § 31–35–402(1)(b), 12B C.R.S. (1986), which provides that one municipality shall not furnish water service in another municipality without the other municipality's consent.

5. Whether, under § 31–35–402(1)(b), 12B C.R.S. (1986), and other applicable Colorado law, the District has the exclusive right to provide water service to the areas that are included within both the District's boundaries and the City's boundaries.

2. The parties entered into a Stipulation to Facts, dated September 30, 1991, which, together with the pleadings and testimony at trial, provide the basis for our factual background.

3. The 1976 agreement was identical to the 1967 agreement, except for one paragraph dealing with bulk water rates, which is not directly relevant to the present dispute. The 1976 agreement (hereinafter referred to as the "Agreement") was operative when this litigation was initiated.

4. For ease of reference, we refer to this bond as the "1981 revenue bond" throughout the opinion.

revenue bond as they came due. The escrowed bond proceeds replaced the District's revenues as the security for the 1981 revenue bond, while the District's revenues became the security for the new bonds.

Second, in 1988, the District reacquired the 1981 revenue bond from the FmHA pursuant to revenue generating legislation enacted by Congress, authorizing the FmHA to sell all notes and bonds in its possession without canceling the protection provided to rural water districts and their lenders under section 1926(b), which prescribes that during the term of a bond held by the FmHA the water services provided by a borrower cannot be curtailed or limited.[5] If the District, as the issuer of the bond, was allowed to reacquire the bond from the FmHA without discharging the debt, the District would remain under the protection of 7 U.S.C. § 1926(b) until the bond obligation is discharged or the bond reaches maturity in 2021.

In 1991, the District filed a complaint against the City in Mesa County District Court, seeking declaratory relief in the form of a determination that the District was the only entity authorized to provide water to domestic water users in the overlap areas, except where the City historically has served consumers. The District asserted, among other things, that under the Agreement and, alternatively, under applicable Colorado law, the District was authorized to provide domestic water service in the overlap areas.[6]

The City filed an answer and counterclaim asserting, among other things, that the District could not serve water in the overlap areas without the City's consent, citing section 31–35–402(1)(b), 12B C.R.S. (1986). The City further alleged that the District was obligated under the Agreement to sell certain facilities to the City. Alternatively, the City claimed that it could terminate the Agreement upon ninety days notice.[7] Both the City and the District relied upon the Agreement and Colorado law—specifically sections 31–35–401 to –417, 12B C.R.S. (1986 & 1994 Supp.), which govern a municipality's authority to provide water and sewage services—as the bases for their claims that each had the exclusive right to provide water in the overlap areas.

The District filed a Motion for Temporary Restraining Order and/or Preliminary Injunction, asserting that the City should be prohibited from providing domestic water service to new customers in the overlap areas, except those areas served by the City prior to 1967. After a hearing, the district court denied the District's motion in an order dated January 10, 1992, because the District failed to demonstrate a danger of irreparable injury.

Upon the filing of cross-motions for summary judgment, the district court determined that the District was not a "municipality" under section 31–35–402(1) and thus it could not rely on that statute.[8] The district court

---

5. The Omnibus Budget Reconciliation Act of 1986 (OBRA), Pub.L. No. 99–509, § 1001, 100 Stat. 1874 (1986) (codified at 7 U.S.C. § 1929a note (1994)), directed the FmHA to sell notes and bonds in its possession in order to lower the federal deficit without removing the protection provided for rural water districts and their lenders under § 1926(b). The Agricultural Credit Act of 1987 (ACA), Pub.L. No. 100–233, § 803, 101 Stat. 1714 (1988) amended § 1001 of OBRA by adding new subsections (f) and (g). *See* ACA, §§ 803(f) & (g), 101 Stat. 1714 (codified at 7 U.S.C. § 1929a note (1994)). The new subsection (g) states that 7 U.S.C. § 1926(b) "shall be applicable to all notes or other obligations sold or intended to be sold under this section." ACA, § 803(g), 101 Stat. 1714 (codified at 7 U.S.C. § 1929a note (1994)). See Part II, *infra*, for a more detailed discussion.

6. In its memorandum brief in support of its motion for summary judgment, the District as-

serted that 7 U.S.C. § 1926(b) also prevented the City from competing with the District while the 1981 revenue bond remained unpaid.

7. The district court agreed with the City and held that the City could terminate the Agreement as of December 31, 1992. The District did not appeal this determination. As conceded at oral argument, the City terminated the Agreement in 1992 during this litigation.

8. Section 31–35–402(1)(b) provides that a "municipality" has the following power:

To operate and maintain water facilities or sewerage facilities or both for its own use and for the use of public and private consumers and users within and without the territorial boundaries of the municipality, *but no water service or sewerage service or combination of them shall be furnished in any other municipality unless the approval of such other municipal-*

also concluded that the City was a "municipality" and the District must therefore obtain the City's consent before serving domestic water consumers in the overlap areas. The district court further ruled that there were disputed issues of fact relating to the applicability of 7 U.S.C. § 1926(b) and set those issues for trial. Specifically, the district court stated that "[i]f it is determined upon a hearing of this matter that there is any outstanding federal debt, 7 U.S.C. 1926(b) prohibits the curtailing of any service provided by a water district that is the recipient of federal funds."

The district court conducted a bench trial on several issues, including the applicability of the federal statute. Richard E. Mitchell (Mitchell), the District's bond counsel, testified as an expert witness in the fields of municipal finance and corporate finance. Mitchell testified that he represented the District in six bond transactions between 1980 and 1987, as well as in the District's reacquisition of the 1981 revenue bond. According to Mitchell, who structured the advance refunding transaction in 1983, the District remained liable if the escrow account was insufficient to make the requisite payments on the 1981 revenue bond. Mitchell further testified that in 1988, the District reacquired the bond from FmHA at the discounted price of approximately $1.5 million, but expressly structured the transaction to prevent a merger and to keep the bond outstanding, rather than simply extinguishing the debt. Mitchell testified that the transaction was structured in this manner in order to maintain the District's flexibility to sell the bond again in the future.

Upon conclusion of the bench trial, in an order dated July 17, 1992, the district court held "that 7 U.S.C. 1926(b) prohibits the City from providing water service to the overlap areas so long as the District's 1981 water revenue bond remains outstanding, which may be until July 1, 2021 (Exhibit 98)." [9] The district court "permanently enjoined the City from performing any act with respect to the District in violation of 7 U.S.C. 1926(b) ... for the life of the subject debt." [10] The district court determined that the 1981 revenue bond was outstanding, expressly relying on the federal statutes and the expert testimony of Mitchell. The district court also found that "[t]he evidence is undisputed that in buying its bond from FmHA the District intended that the debt remain outstanding so the bond could be resold if necessary." The district court, however, rejected the District's argument that it was a "municipality" under section 31–35–402(1)(b) and therefore enjoyed the protections provided by that statute. The City appealed the district court's decision that 7 U.S.C. § 1926(b) applies in the present case. The District cross-appealed, contending, among other things, that the district court's determination on summary judgment that it was not a "municipality" under section 31–35–402(1)(b) was erroneous.

The court of appeals affirmed the trial court's ruling that the District was entitled to the protection afforded by 7 U.S.C. § 1926(b) against the City's efforts to provide water in the overlap areas. *Ute Water Conservancy Dist. v. City of Grand Junction*, 870 P.2d 593 (Colo.App.1993). The court of appeals vacated the portion of the district court's summary judgment order dealing with the applicability of section 31–35–402(1) because consideration of that issue was premature and presented no justiciable controversy. *Id.* at 598–99. The City petitioned this court for certiorari to review the applicability of 7 U.S.C. § 1926(b) to the present case.[11] The District filed a cross-petition to review the

---

*ity is obtained as to the territory in which the service is to be rendered.*

§ 31–35–402(1)(b), 12B C.R.S. (1986) (emphasis added).

**9.** The other issues resolved by the district court in its order dated July 17, 1992, are not before us.

**10.** In an order dated September 11, 1992, the district court denied the City's Motion to Amend Findings and Judgment, emphasizing that "in the event of any conflict between 7 U.S.C. 1926(b) and any contract provision or city ordinance, the former controls[.]" The district court also refused to address four additional issues related to 7 U.S.C. § 1926(b) raised for the first time by the City in its Motion to Amend Findings and Judgment, including the argument that the statute violates the Tenth Amendment to the United States Constitution.

**11.** See issues 1 to 3, *supra* n. 1.

section 31–35–402(1)(b) issue.[12] We granted the petition and the cross-petition.

The City contends that the lower courts erred in finding that 7 U.S.C. § 1926(b) prohibits it from supplying water to consumers in the overlap areas because the indebtedness required by section 1926(b) was discharged when the District purchased the bond from the FmHA in 1988 or, alternatively, when the District advance refunded the bond in 1983. The City also asserts that the court of appeals erred in implicitly ruling that section 1926(b) preempts state law. Finally, the City argues that under the facts of this case, 7 U.S.C. § 1926(b) violates the Tenth Amendment to the United States Constitution. We address each of the City's arguments in turn.

## II.

◼ The City first contends that the court of appeals erred in implicitly finding that the federal statutes preempt state law in resolving the present dispute. Contrary to the City's contention, we hold that the applicable federal statutes preempt state law in this case.[13] More precisely, we hold that: (1) section 1926(b) expressly preempts state law governing the authority of a public entity to provide domestic water service; and (2) section 1926(b) and other applicable federal statutes implicitly preempt state law regulating the discharge of debt evidenced by a bond.

◼ The preemption doctrine originates in the Supremacy Clause of the United States Constitution, which provides:

This constitution, and the laws of the United States which shall be made in pursuance thereof ..., shall be the supreme law of the land; and the judges in every state shall be bound thereby; anything in the constitution or laws of any state to the contrary notwithstanding.

U.S. Const. art. VI, cl. 2. We have recognized that federal law preempts state law when: (1) the federal law actually conflicts with state law; (2) the federal law expressly preempts state law; or (3) the federal law implicitly preempts state law. *Banner Advertising, Inc. v. City of Boulder,* 868 P.2d 1077, 1080–84 (Colo.1994); *see also Cipollone v. Liggett Group, Inc.,* —— U.S. ——, ——, 112 S.Ct. 2608, 2617–18, 120 L.Ed.2d 407 (1992).[14] Actual conflict occurs when it is impossible for a private party to comply simultaneously with both state and federal laws, *see Banner,* 868 P.2d at 1080, or when the state law stands as an obstacle to the accomplishment and execution of the full purpose and objectives of Congress. *See, e.g., Ray v. Atlantic Richfield Co.,* 435 U.S. 151, 158, 98 S.Ct. 988, 994–95, 55 L.Ed.2d 179 (1978); *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941); *Evans v. Board of County Comm'rs of County of Boulder,* 994 F.2d 755, 760 (10th Cir.1993); *Belgard v. United Airlines,* 857 P.2d 467, 469 (Colo.App.1992), *cert. denied sub nom. Belgard–Krause v. United Airlines,* —— U.S. ——, 114 S.Ct. 1066, 127 L.Ed.2d 386 (1994). Federal law expressly preempts state law when the statute contains explicit language demonstrating that Congress intended such preemption. *E.g., Cipollone,* —— U.S. at ——, 112 S.Ct. at 2617–18; *see also Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977), *reh'g denied,* 431 U.S. 925, 97 S.Ct. 2201, 53 L.Ed.2d 240 (1977). Finally, federal law implicitly preempts state law when federal law occupies the field—that is to say, preemption may be inferred, absent any express statutory language, from a " 'scheme of federal regulation ... so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it.' " *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982) (quoting *Rice v. Santa Fe Elevator*

---

**12.** See issues 4 and 5, *supra* n. 1.

**13.** State common-law principles, however, also support our conclusion that the 1981 revenue bond remains outstanding. See Part III, *infra,* for a more detailed discussion.

**14.** The federal courts generally have been less rigid in classifying the various types of preemption. For example, the United States Supreme Court has recognized that "[i]n the final analysis, there can be no one crystal clear distinctly marked formula [to analyze federal preemption cases]." *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941).

*Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)). Implied preemption also exists when " 'the Act of Congress . . . touch[es] a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.' " *Id.* However, " '[t]he exercise of federal supremacy is not lightly to be presumed.' " *New York Dept. of Social Services v. Dublino,* 413 U.S. 405, 413, 93 S.Ct. 2507, 2513, 37 L.Ed.2d 688 (1973) (quoting *Schwartz v. Texas,* 344 U.S. 199, 202–03, 73 S.Ct. 232, 235, 97 L.Ed. 231 (1952)); *accord Rosa v. Warner Elec. Contracting,* 870 P.2d 1210, 1212 (Colo.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 69, 130 L.Ed.2d 25 (1994).

We begin our preemption analysis by examining section 1926(b), which expressly preempts state law to the extent that the statute protects the indebted entity from competition while the debt is outstanding. Section 1926(b) states:

> The service provided or made available through any such association [15] *shall not be curtailed or limited* by inclusion of the area served by such association within the boundaries of any municipal corporation or other public body, or by the granting of any private franchise for similar service within such area during the term of such [FmHA] loan [to the District]. . . .

Consolidated Farm and Rural Development Act, Pub.L. No. 87–128, § 306, 75 Stat. 308 (1961) (codified at 7 U.S.C. § 1926(b) (1994)) (emphasis added). Thus, the language of section 1926(b) prohibiting an entity from curtailing or limiting the District's services expressly preempts state law governing the authority of a public entity to provide domestic water service. We must next determine whether the applicable federal law in the present case, including section 1926(b), implicitly preempts state commercial law on discharge of obligations on a bond.

■ In order to ascertain whether a federal statute implicitly preempts state law, a court must determine the intent of Congress in enacting the federal law. *See, e.g., Rosa v. Warner Elec. Contracting,* 870 P.2d at 1212.

Moreover, if a federal statute does not expressly preempt state law, "such an intention may be clear from the pervasiveness of the federal regulatory scheme, the need for national uniformity, or the danger of conflict between the enforcement of state law and the administration of federal programs." *Rocky Mtn. Airways, Inc. v. Pitkin County,* 674 F.Supp. 312, 319 (D.Colo.1987) (citing *Pennsylvania v. Nelson,* 350 U.S. 497, 76 S.Ct. 477, 100 L.Ed. 640 (1956)). We conclude that the legislative history of section 1926(b), the pervasiveness of the federal regulatory scheme, and the need for national uniformity support our conclusion that the applicable federal statutes preempt state law on discharge of bond obligations in the present case.

The legislative history of section 1926(b) demonstrates that Congress intended to protect rural water districts from competition in order to encourage rural water development. Senate Report No. 566, constituting part of the legislative history of section 1926(b), states:

> Section 306 [now codified as section 1926(b) ] would authorize loans to nonprofit associations and public or quasi-public agencies . . . for the conservation, development, use and control of water. . . . Under the Water Facilities Act, financial assistance is authorized to governmental and other agencies and to other persons. . . . However, the Water Facilities Act requires the benefits of such loans to be on farms. By interpretation, loans to associations cannot now be made unless a major part of the use of the facility is to be by farmers. This section would broaden the utility of this authority somewhat by authorizing loans to associations serving farmers, ranchers, farm tenants, and other rural residents. This provision authorizes the very effective program of financing the installation and development of domestic water supplies and pipelines serving farmers and others in rural communities. By including service to other rural residents, the cost per user is reduced and the loans are more secure in addition to the commu-

---

**15.** An "association" is an entity that has received a loan from the FmHA. *Ute Water Conservancy Dist.,* 870 P.2d at 596. See Part III, *infra,* for a more detailed discussion.

nity benefits of a safe and adequate supply of running household water. A new provision *[7 U.S.C. § 1926(b)] has been added to assist in protecting the territory served by such an association facility against competitive facilities, which might otherwise be developed with the expansion of the boundaries of municipal and other public bodies into an area served by the rural system.*

S.Rep. No. 566, 87th Cong., 1st Sess., *reprinted in* 1961 U.S.C.C.A.N. 2243, 2309 (emphasis added). Federal courts have concluded that "[t]his history indicates two congressional purposes behind § 1926: (1) to encourage rural water development by expanding the number of potential users of such systems, thereby decreasing the per-user cost, and (2) to safeguard the viability and financial security of such associations (and FmHA's loans) by protecting them from the expansion of nearby cities and towns." *City of Madison, Mississippi v. Bear Creek Water Ass'n, Inc.,* 816 F.2d 1057, 1060 (5th Cir. 1987); *see also Jennings Water, Inc. v. City of N. Vernon, Indiana,* 895 F.2d 311, 315 (7th Cir.1989), *aff'g* 682 F.Supp. 421 (S.D.Ind. 1988); *Moore Bayou Water Ass'n, Inc. v. Town of Jonestown, Mississippi,* 628 F.Supp. 1367, 1370 (N.D.Miss.1986). Furthermore, courts have recognized that "[t]he statute's legislative history confirms that the Congress intended a broad reading for section 1926(b)." *Jennings Water, Inc.,* 895 F.2d at 315; *accord North Shelby Water Co. v. Shelbyville Mun. Water & Sewer Comm'n,* 803 F.Supp. 15, 21 (E.D.Ky.1992). Therefore, the legislative history of section 1926(b) demonstrates that Congress enacted this statute in order to protect rural water districts, as well as loans made to those districts, and supports our conclusion that Congress implicitly intended to preempt any state law that intrudes into this field of federal interest. We next examine the other applicable federal statutes and conclude that they also implicitly preempt state law.

The pervasiveness of the federal regulatory scheme governing the sale of bonds held by the FmHA demonstrates that Congress intended that these federal laws preempt state laws governing bond redemption. As part of an overall effort to reduce the federal deficit, Congress enacted section 1001 of the Omnibus Budget Reconciliation Act of 1986 (OBRA). This statute, in pertinent part, states:

(a) Sales Required.—The Secretary of Agriculture . . . shall sell notes and other obligations held in the Rural Development Insurance Fund established under section 309A of the Consolidated Farm and Rural Development Act in such amounts as to realize net proceeds to the Government of not less than [specified amounts in specified years].

Omnibus Budget Reconciliation Act of 1986, Pub.L. No. 99–509, § 1001, 100 Stat. 1874 (1986) (codified at 7 U.S.C. § 1929a note (1994)). Congress subsequently enacted section 803 of the Agricultural Credit Act of 1987 (ACA), which amended section 1001 of OBRA by adding new subsections (f) and (g). Subsections (f) and (g) state, in relevant part:

(f) Right of First Refusal.—

(1) In General.—Before conducting a sale of a portfolio of notes or other obligations under this section, *the Secretary of Agriculture shall—*

(A) *determine whether the issuer of any unsold note or other obligation desires to purchase the note or other obligation;* and

(B) if so, hold open for 30 days, an offer to sell the note or other obligation to the issuer at a price to be determined under paragraph (2).

. . . .

(g) Applicability of Prohibition on Curtailment or Limitation of Service.—Section 306(b) of the Consolidated Farm and Rural Development Act (*7 U.S.C. 1926(b)) shall be applicable to all notes or other obligations sold or intended to be sold under this section.*

The Agricultural Credit Act of 1987, Pub.L. No. 100–233, § 803, 101 Stat. 1714 (1988) (codified at 7 U.S.C. § 1929a note (1994)) (emphasis added). We conclude that Congress intended that this type of pervasive statutory scheme—which provides the issuer with a right of first refusal and expressly applies the provisions of section 1926(b) for protection against curtailment or limitation of

service to "all notes or other obligations sold or intended to be sold under this section"—preempt state law pertaining to the sale of bonds held by the FmHA.

Moreover, Congress surely did not intend to allow each state to decide independently whether a bond held by the FmHA would be discharged upon advance refunding or reacquisition by the issuer under that particular state's version of the Uniform Commercial Code. The Congressional purpose underlying section 1926(b) is to protect rural water districts, which should include all rural water districts, not just those districts in states with favorable versions of the Uniform Commercial Code. The other such purpose is to protect federal loans to those districts.[16] Thus, the federal government has an interest in regulating FmHA loans and the bonds that evidence the district's obligations for such loans, and in ensuring uniform treatment in every state for purchasers and issuers of those bonds.[17] Therefore, the pervasiveness of the federal regulations and the need for national uniformity provide further support for our conclusion that Congress intended that the applicable federal statutes preempt state law on bond redemption in the present case.

### III.

The City contends that the 1981 revenue bond is no longer outstanding and thus the District is no longer protected by section 1926(b). We begin our analysis of this issue by examining 7 U.S.C. § 1926(b), which states:

The *service provided* or made available through any such association *shall not be curtailed or limited by inclusion of the area served by such association [the Dis-*

trict] within the boundaries of any municipal corporation or other public body, or by the granting of any private franchise for similar service within such area during the term of such [FmHA] loan [to the District]; nor shall the happening of any such event be the basis of requiring such association to secure any franchise, license, or permit as a condition to continuing to serve the area served by the association at the time of the occurrence of such event.

Consolidated Farm and Rural Development Act, Pub.L. No. 87–128, § 306, 75 Stat. 308 (1961) (codified at 7 U.S.C. § 1926(b) (1994)) (emphasis added). Therefore, to receive the protection of this statute the District must be an "association" and the FmHA loan must be outstanding.

The City does not dispute that the District is an "association" under section 1926(b). *Ute Water Conservancy Dist.*, 870 P.2d at 596; *see Pinehurst Enterprises, Inc. v. Town of S. Pines*, 690 F.Supp. 444, 452 (M.D.N.C. 1988) (defining "any such association" under 7 U.S.C. § 1926(b) as "an entity which has received a loan from the Secretary (FmHA)"), *aff'd*, 887 F.2d 1080 (4th Cir.1989) (without published opinion). Rather, the City contends that the District lost the protection afforded under this statute either when it repurchased the 1981 revenue bond from the FmHA in 1988, or advance refunded the 1981 revenue bond in 1983. The City's contention is based on the premise that either of these two transactions was sufficient to discharge the 1981 revenue bond under state law, thereby terminating the requisite outstanding debt under section 1926(b). For the reasons stated below, we disagree.

---

16. Additionally, in enacting the comprehensive ACA, Congress intended to facilitate the sale of FmHA loans in a secondary market. *See* pp. 26–27, *infra*.

17. This is somewhat analogous to the federal government's interest in regulating federal bonds, which has been held to preempt state laws that interfere with the federal regulations. *See, e.g., Free v. Bland*, 369 U.S. 663, 669, 82 S.Ct. 1089, 1093–94, 8 L.Ed.2d 180 (1962). In that case, the Court held that federal regulations concerning a right of survivorship in United States savings bonds preempted conflicting state

community property law provisions. The Court stated: "The success of the management of the national debt depends to a significant measure upon the success of the sales of the savings bonds. The Treasury is authorized to make the bonds attractive to savers and investors." *Id.* (footnote omitted). Although the United States Government was not the bond issuer in the present case, Congress enacted revenue generating legislation designed to reduce the federal deficit by encouraging the FmHA to sell bonds and notes in its possession.

A.

■ The City first contends that the underlying debt evidenced by the 1981 revenue bond was discharged when the District repurchased the bond from the FmHA in 1988. The City argues that under the Uniform Commercial Code (UCC), as adopted in Colorado, and state common law, the underlying debt was discharged when the District repurchased the 1981 revenue bond.[18] Contrary to the City's position, however, the applicable federal statutes, as well as state common-law principles, support the court of appeals' conclusion that the District's reacquisition of the 1981 revenue bond did not discharge the underlying debt.

### 1. Federal Statutory Law

The plain language of section 803(g) of the ACA authorizes the FmHA to sell notes and bonds in its possession without eliminating the protection provided under section 1926(b) for the bond issuer. The District asserts that section 803(g) applies to all notes and bonds sold by the FmHA, including those sold back to the issuer. The City disagrees, arguing that the underlying debt required by section 1926(b) was discharged when the FmHA sold the bond back to the District, the issuer. Section 803(g) extends the protection of section 1926(b) to "*all* notes or other obligations sold or intended to be sold under this section." ACA, § 803(g), 101 Stat. 1714 (codified at § 1929a note (1994)) (emphasis added). We must determine whether Congress intended that "all ... obligations sold ... under this section" include reacquisition by an issuer of a bond held by the FmHA, where the parties intended not to discharge the bond. Because section 803(f) of the ACA provides a comprehensive scheme for selling bonds held by the FmHA back to the issuers, we conclude that Congress intended to authorize the type of transaction that occurred in the present case.

■ When interpreting a federal statute, courts first look to the language of the statute. *See, e.g., Rubin v. United States,* 449 U.S. 424, 429–30, 101 S.Ct. 698, 701–02, 66 L.Ed.2d 633 (1981) ("When we find the terms of a statute unambiguous, judicial inquiry is complete, except in 'rare and exceptional circumstances.'") (quoting *Crooks v. Harrelson,* 282 U.S. 55, 60, 51 S.Ct. 49, 50, 75 L.Ed. 156 (1930)). When our reading of the statute is consistent with the legislative history and purpose, as in the present case, no such "rare and exceptional circumstances" exist. *See id.* at 430, 101 S.Ct. at 701. Therefore, we are guided by the unambiguous language in section 803(g), extending the protection of section 1926(b) to "*all* notes or other obligations sold or intended to be sold under this section." ACA, § 803(g), 101 Stat. 1714 (codified at § 1929a note (1994)) (emphasis added). This language supports our conclusion that the 1981 revenue bond was not discharged when the District reacquired the instrument from the FmHA in 1988.

■ The word "all" is an unambiguous term. *Hudgeons v. Tenneco Oil Co.,* 796 P.2d 21, 23 (Colo.App.1990); *see also O'Brien v. Village Land Co.,* 780 P.2d 1, 2–3 (Colo. App.1988) (stating that the word "all," used in a deed, is an unambiguous term meaning "the whole of, the whole number or sum of, or every member or individual component of"), *rev'd on other grounds,* 794 P.2d 246, 250 (Colo.1990). The dictionary definition and common usage of the word "all" do not provide for an exception or exclusion that is not expressly specified. *See, e.g., Cedar Rapids Community School Dist. v. City of Cedar Rapids,* 252 Iowa 205, 106 N.W.2d 655, 659 (1960); *see also* 3 Words and Phrases 212–25 (1953 & 1994 Supp.). Black's Law Dictionary defines the word "all" as: "The whole number or sum of—used collectively, with a plural noun or pronoun expressing an aggregate. Every member of [sic] individual component of; each one of—used with a plu-

---

18. More precisely, the City contends that Article 3 of the UCC should be looked to for guidance on the issue of discharging a bond because Article 8 of the UCC, which deals with securities, is silent on this issue. *See E.F. Hutton & Co. v. Manufacturers Nat'l Bank of Detroit,* 259 F.Supp. 513, 517 (E.D.Mich.1966). According to the City, under the law established by several sections in Article 3, including §§ 4–3–601(2) & (3), 4–3–603, and 4–3–802(1)(b), 2 C.R.S. (1992), the 1981 revenue bond was discharged when the District reacquired it in 1988.

ral noun." *Black's Law Dictionary* 74 (6th ed. 1990). Section 803(g) does not provide for any exception to the general rule that the protection provided to rural water districts under section 1926(b) "shall be applicable to *all* notes or other obligations sold or intended to be sold under this section" and we decline to create such an exception. *See* ACA, § 803(g), 101 Stat. 1714 (codified at 7 U.S.C. § 1929a note (1994)) (emphasis added).[19] Therefore, after considering the plain language of section 803(g), we hold that it authorized the FmHA to sell *all* notes or other obligations without removing the protection provided to rural water districts under section 1926(b), including selling the 1981 revenue bond back to the issuer when the parties intended that the bond remain outstanding.

The fact that Congress provided for a comprehensive scheme for selling bonds held by the FmHA back to the issuers also supports our conclusion that Congress intended to allow an issuer to reacquire its bond or note without losing the protection provided under section 1926(b). *See* ACA, §§ 803(f) & (g), 101 Stat. 1714 (codified at 7 U.S.C. § 1929a note (1994)). We agree with the district court that:

> By including this provision [section 803(g) ] in the same act which gave the rural water associations the right of first refusal to purchase their obligations from FmHA, Congress obviously intended that associations which exercise this right would still enjoy the protection of 7 U.S.C. 1926(b) so long as the obligation existed. This conclusion accords with Congress' intent in enacting section 1926(b) not only to protect FmHA loans but to promote rural water development, as noted above.

Trial Court Order of July 17, 1992, at 4.

Although the language of section 803(g) provides a sufficient basis for us to resolve this issue, our conclusion is fully consistent with the purpose of section 1926(b) and section 803(g). As the Colorado Court of Appeals recognized in the present case, "the purpose of 7 U.S.C. § 1926(b) is:

> 'to assist in protecting the territory served by such an association against competitive facilities, which might otherwise be developed with the expansion of municipal and other public bodies into an area served by he rural system.'"

*Ute Water Conservancy Dist.*, 870 P.2d at 596 (quoting *Jennings Water, Inc.*, 895 F.2d at 315 (quoting from S.Rep. No. 566, 87th Cong., 1st Sess., *reprinted in* 1961 U.S.C.C.A.N. 2243, 2309)). Section 803(g) was enacted as part of the ACA, which has been referred to as "the most comprehensive and far-reaching legislation addressing the delivery of agricultural credit in many years." H.R.Rep. No. 100–295(I), 100th Cong., 1st Sess. 53, *reprinted in* 1987 U.S.C.C.A.N. 2723, 2725. One of the primary purposes of enacting this comprehensive legislation was to create an improved secondary market for FmHA loans. *See id.* at 54, *reprinted in* 1987 U.S.C.C.A.N. at 2725–26. Our conclusion that Congress intended that section 803(g) apply when the bond issuer reacquires the instrument is consistent with the purpose, as well as the terms, of the ACA. Therefore, we hold that section 1926(b) applies to all notes and bonds sold by the FmHA—including those reacquired by the issuer with the intent not to discharge the instrument, as in the present case—and that the District did not discharge the 1981 revenue bond when it reacquired the instrument from the FmHA in 1988.

### 2. State Law

 State law also supports our conclusion that the 1981 revenue bond was not discharged when the District reacquired the instrument in 1988. Under common-law principles, the intent of the parties dictates

---

**19.** In a situation analogous to the present case, the United States Court of Appeals for the Tenth Circuit held that a federal statute, 12 U.S.C. § 1823(c)(2)(A), preempted Colorado's version of the UCC—prohibiting the assignment of a letter of credit—because the federal "statute clearly gives FDIC/Corporation the authority to purchase '*any assets*' of a failed bank." *Federal*

*Deposit Ins. Corp. v. Bank of Boulder*, 911 F.2d 1466, 1472–73 (10th Cir.1990) (en banc) (emphasis added), *cert. denied*, 499 U.S. 904, 111 S.Ct. 1103, 113 L.Ed.2d 213 (1991). The court further held "that section 1823(c)(2)(A) creates a power in FDIC/Corporation to purchase any assets, including assets nontransferable under state law." *Id.* at 1473.

whether the reacquisition by the issuer of a bond that is also a negotiable instrument discharges the debt or functions simply as a purchase and sale of the instrument.

Colorado's version of the Uniform Commercial Code (UCC) does not provide clear guidance as to how to answer the question before us of whether a bond is discharged when reacquired by the issuer.[20] We therefore look to state common-law principles to supplement the UCC as adopted in Colorado. § 4–1–103, 2 C.R.S. (1992) ("Unless displaced by the particular provisions of this title, the principles of law and equity . . . shall supplement its provisions.").

Case law supports our conclusion that the intent of the parties dictates whether the repurchase of a bond, which is also a negotiable instrument, by the issuer discharges the underlying debt or merely functions as an acquisition of the instrument.[21] *See, e.g., Fidelity & Columbia Trust Co. v. Louisville Railway Co.*, 258 Ky. 817, 81 S.W.2d 896, 899 (1935) (citing numerous cases and secondary authorities to support its conclusion that: "The rule recognized without exception by American courts is that a corporation may purchase its own bonds and reissue them where there is a manifest intention to keep them alive."); *see also* 2 Leonard A. Jones, *The Law of Bonds and Bond Securities* § 608, at 11–12 (4th ed.1935) (stating that private corporations can reacquire bonds that they have issued and subsequently reissue those bonds "[i]f the facts show that, in reacquiring the bonds there was no intention that they should thereby be paid. . . ."); 11 C.J.S.

*Bonds* § 61 (1938 & 1994 Supp.) ("Delivery of a bond, with the intention and direction that it be canceled, to the obligor, or a third person, extinguishes the bond.") (footnotes omitted); *see generally Columbia Savings v. Zelinger*, 794 P.2d 231, 234–36 (Colo.1990) (stating that the intent of the parties determines whether a debt was discharged under Article 3 of the UCC). In the present case, the intent of the parties involved in the 1988 transaction (*i.e.*, the FmHA and the District) was to keep the 1981 revenue bond active and not discharge the debt after the District repurchased the instrument from the FmHA. Although the FmHA had no further rights or obligations under the 1981 revenue bond, neither the FmHA nor the District intended to discharge or cancel the bond. This conclusion is supported by expert testimony, trial exhibits, and the findings of the trial court.

First, the District's bond counsel, Richard E. Mitchell, who structured the 1988 transaction, in which the District repurchased the 1981 revenue bond from the FmHA, testified as an expert witness at trial that the transaction was structured to effectuate the District's intent to reacquire the bond without discharging the underlying debt in order to enable the District to resell the bond in the future. The City provided no expert testimony to the contrary.

Second, a letter dated June 28, 1988, from the FmHA and the District to the escrow agent directed the escrow agent to make payments of principal and interest on the 1981 bond, as they came due, to the District

**20.** Article 8 of the UCC applies to certificated securities, including the 1981 FmHA bond, which can also be negotiable instruments. *See* § 4–8–105, 2 C.R.S. (1992). Article 8 provides for purchases where the purchaser acquires the same rights as those of the seller. *See* §§ 4–8–301, –313, 2 C.R.S. (1992). Article 8 contains no specific provision on discharge and does not prevent an issuer from reacquiring its own security.

Although Article 3 of the UCC, concerning negotiable instruments, expressly states that it does not apply to investment securities, § 4–3–103(1), 2 C.R.S. (1992); *see* § 4–8–102(1)(d), 2 C.R.S. (1992), other authority supports the proposition that courts may look to Article 3 for "guidance" when Article 8 is silent, because a bond can also be a negotiable instrument, *see, e.g., E.F. Hutton & Co. v. Manufacturers Nat'l*

*Bank of Detroit*, 259 F.Supp. 513, 517 (E.D.Mich. 1966); *see also* 12 Am.Jur.2d *Bonds* § 51 (1964 & 1995 Supp.); 11 C.J.S. *Bonds* § 63 (1938 & 1994 Supp.). Section 4–3–601 governs the discharge of debt under Article 3, but does not provide clear guidance as to how to answer the question before us.

**21.** The City also argues that under common-law principles, the bond was discharged, citing *Fitch v. Hammer*, 17 Colo. 591, 31 P. 336 (1892). That case and other cases cited by the City, however, support the proposition that payment by one of several joint debtors upon a negotiable instrument discharges the debt as to all of the joint debtors, which is not the situation in the present case.

after the District repurchased the bond. This letter demonstrates that the District intended that the bond remain outstanding, even though the District was at that time both the holder of the bond and the debtor.

■ Third, the instrument itself demonstrates that the FmHA transferred the 1981 revenue bond to the District, but did not intend to cancel it. By endorsing the back of the instrument, the FmHA transferred the bond to the District rather than marking the bond "paid in full," which would have canceled or discharged the debt. Mitchell contrasted other transactions involving the reacquisition of a bond held by the FmHA in which the issuer paid the FmHA and received its bonds marked "paid in full" on the face of the instruments. The manner in which the FmHA executed and transferred the instrument provides concrete evidence to support our conclusion that the FmHA, as well as the District, intended that the 1981 revenue bond remain outstanding after the District reacquired the instrument in 1988.[22]

■ Fourth, the trial court determined that the parties intended that the debt not be discharged and stated that the evidence to this effect was "undisputed." Determining the intent of the parties involves a factual finding that should not be disturbed on appeal unless clearly erroneous. *See Zelinger,* 794 P.2d at 235. Specifically, the district court concluded that "the District's mere acquisition of its bond [did not] extinguish the obligation." In determining that the bond is still outstanding, the trial court expressly found the expert testimony of the District's bond counsel, Mitchell, to be more persuasive

than evidence relied upon by the City.[23] Therefore, state law principles, the evidence in the present case, and the district court's findings all support our conclusion that the District repurchased the bond without discharging the underlying debt.

### B.

■ The City alternatively contends that the 1981 revenue bond was discharged when the District advance refunded the bond in 1983. The applicable federal statutes, as well as state common-law principles, however, do not support the City's contention.

As noted above, the purpose of 7 U.S.C. § 1926(b) is to protect rural water districts, as well as loans made to those districts. *E.g., City of Madison,* 816 F.2d at 1060. Moreover, Congress intended that section 1926(b) be read broadly. *Jennings Water, Inc.,* 895 F.2d at 315. In altering the source of repayment for the 1981 revenue bond, the District did not discharge its underlying obligation to repay the FmHA. Allowing the District financial flexibility while at the same time protecting the FmHA's loan is fully consistent with the well-established purposes of section 1926(b).

The evidence presented to the trial court in the present case further supports our conclusion that the advance refunding transaction did not discharge the 1981 revenue bond. We agree with the court of appeals that:

Here, although the original lien on the district revenues brought about by the 1981 bond issue was discharged, those revenues were at the same time encumbered

---

22. The City further contends that Congress left the FmHA with no discretion to leave a debt or obligation outstanding upon selling the 1981 revenue bond back to the issuer. The City cites 7 U.S.C. § 1929a(e) (1994), which states that "[t]he Secretary and any subsequent purchaser of such notes and other obligations sold by the Secretary on a nonrecourse basis shall be relieved of any responsibilities that might have been imposed had the borrower remained indebted to the Secretary." We do not find the City's argument persuasive. Rather, we agree with the District that § 1929a(e) relieves the purchaser of a note or bond held by the FmHA from any special obligation that the FmHA had to the borrower, but this statute does not relieve the borrower from the obligation to repay the debt.

23. The City had argued that footnotes to the District's financial statements provided evidence that the District redeemed, or paid off, the 1981 revenue bond because the notes contained the word "redeemed." The context of the footnotes as a whole, however, does not suggest that the bond was discharged. Rather, the footnotes state that:

Upon redemption of the Water Revenue Bonds, Series 1981, the District received the right to all future payments from the trust [paid by the escrow agent]. Payments from the trust are due on January 1, and July 1 of each year through July 1, 2021 [the maturity date of the 1981 revenue bond].

by the refunding issue of 1983. The district's indebtedness thus remains, even though the source of repayments for the 1981 bonds has shifted to the escrowed funds. Furthermore, should the escrowed funds be insufficient, the shortfall would be made up from district revenues, which are also the basis of payment for the 1983 bonds.

*Ute Water Conservancy Dist.,* 870 P.2d at 597. Mitchell, the District's bond counsel, testified that the District remained liable to pay the debt if the newly created escrow account was ever insufficient. Therefore, Mitchell's expert testimony, which was not controverted by any expert testimony for the City, supports the conclusion that the 1983 advance refunding transaction did not discharge the District's obligation to make payments to the FmHA on the 1981 revenue bond. *See id.* (citing *2416 Corp. v. Board of Trustees,* 209 Ill.App.3d 504, 154 Ill.Dec. 276, 282–83, 568 N.E.2d 276, 282–83 (1991) (stating that the trial court can rely on "an expert's opinion on the meaning to be ascribed to terms of art in a specialized area of the law")).

▆▆▆▆ State law principles governing advance refunding transactions also support our conclusion that the 1981 revenue bond was not discharged as a result of the 1983 transaction. "As refunding bonds are issued to refinance an outstanding issue, they do not create a new obligation but are considered to be an extension of the obligation of the original bonds." *2416 Corp.,* 154 Ill.Dec. at 278, 568 N.E.2d at 278; *see also* 1 Jones §§ 393–94, at 423–25. An advance refunding does not eliminate a bondholder's fundamental right to payment on the bond. *See Morton Arboretum v. Thompson,* 605 F.Supp. 486, 490–92 (N.D.Ill.1984); *Hammerman v. Illinois State Toll Highway Auth.,* 148 Ill. App.3d 259, 101 Ill.Dec. 471, 474–75, 498 N.E.2d 795, 798–99 (1986). Therefore, we hold that the 1983 advance refunding transaction did not discharge the District's obligation to make payments on the 1981 revenue bond to the FmHA.[24]

## IV.

▆▆▆▆ Lastly, the City argues that under the facts of the present case, 7 U.S.C. § 1926(b) violates the Tenth Amendment to the United States Constitution.[25] The Tenth Amendment to the United States Constitution provides: "The powers not delegated to the United States by the constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people." U.S. Const. amend. X. Specifically, the City argues that the power of Congress to enact section 1926(b) rests upon the spending clause of the United States Constitution, *see*

---

**24.** The City also argues that the federal courts have interpreted § 1926(b) as requiring "continuing indebtedness." *See, e.g., Glenpool Utility Services Auth. v. Creek County Rural Water Dist. No. 2,* 861 F.2d 1211, 1214 (10th Cir.1988), *cert. denied,* 490 U.S. 1067, 109 S.Ct. 2068, 104 L.Ed.2d 633 (1989). The City suggests that § 1926(b) requires an outstanding debt to the federal government. We reject this position because § 1926(b) requires only that the bond be outstanding, it does not require that the District be indebted to the federal government. The unambiguous language of the OBRA, and its subsequent amendments under the ACA, make it clear that the protection provided for rural water districts under § 1926(b) remains even when the FmHA sells a note or bond in its possession to an entity other than the federal government. ACA, § 803(g), 101 Stat. 1714 (codified at 7 U.S.C. § 1929a note (1994)). In fact, Congress enacted the OBRA, and subsequent amendments under the ACA, in order to ensure that the protection provided for in § 1926(b) would remain intact even after the FmHA sold the note or other obligation to a third party or the issuer. The

City's argument, in effect, would have us ignore both the clear language and the purpose of the federal statutes. Although we agree with the City that the District is no longer obligated to the FmHA under the 1981 revenue bond, we do not agree with the City that the bond is no longer outstanding. Moreover, we agree with the City to the extent that the "continuing debt" requirement simply paraphrases the statutory requirement that the bond be outstanding in order to qualify for the protection provided under § 1926(b). As noted throughout this opinion, however, we conclude that the 1981 revenue bond remains outstanding and thus § 1926(b) protects the District from competition in the overlap areas until the bond is discharged or reaches maturity.

**25.** The District asserts that the City failed to raise its Tenth Amendment challenge in a timely manner and thus has waived this argument. For the limited purpose of disposing of this particular issue, we assume that the City raised its Tenth Amendment challenge in a timely manner.

U.S. Const. art. I, § 8, cl. 1, which is subject to various limitations.[26] Application of section 1926(b) would exceed several of these limitations, the City argues, if it is applied after the District has paid off and purchased the bond from the FmHA. The City bases its argument on the premise that because the FmHA is no longer the bond holder, there is no federal interest involved.

Contrary to the City's assertion, however, we conclude that the federal interest of encouraging rural water districts to provide their services to rural residents throughout the United States exists even after the FmHA has sold a bond issued by such a district. The legislative history of section 1926(b) supports our conclusion that Congress intended that section 1926(b) protect rural water districts, as well as the federal loans made to them. The City's argument would have us ignore one of the two clear purposes of enacting section 1926(b) and focus exclusively on protecting federal loans, which we cannot do. Thus, we conclude that the federal interest of encouraging rural water districts to provide water services to rural residents throughout the country, and the protection afforded to those rural water districts under section 1926(b), exists even when the water district is no longer indebted to the federal government.

Furthermore, section 1926(b) does not violate the Tenth Amendment when "[t]he limits on the provision of water service are thus restricted in time and in scope so as not to disable the city severely from performing its governmental function." *City of Madison*, 816 F.2d at 1061. In *City of Madison*, the Fifth Circuit Court of Appeals recognized that section 1926(b) limits a city's provision of water service but "does not, however, permanently curtail the city's authority [to provide water service], because it applies only while the federal debt is outstanding." *Id.* Accordingly, the court upheld the constitutionality of section 1926(b) against a Tenth Amendment challenge. *Id.; see also Glenpool*, 861 F.2d at 1216.

Applying the analysis of *City of Madison* to the present case, we conclude, as did the court of appeals, that section 1926(b) does not violate the Tenth Amendment to the United States Constitution because the monopoly granted to the District is limited in time and geographic scope. *Ute Water Conservancy Dist.*, 870 P.2d at 598 (citing *City of Madison*, 816 F.2d 1057). First, the duration of the protection provided to the District under section 1926(b) is limited by the outstanding debt requirement, *i.e.* until the bond is discharged or reaches its maturity in 2021. Thus, the City is prevented from providing water services only during the period of time that the 1981 revenue bond remains outstanding. As in *City of Madison*, "[a]t most, [s]ection 1926(b) ordains a dual water authority function within a municipal area for a period of time." *City of Madison*, 816 F.2d at 1061. Second, the geographic scope of the protection provided to the District under section 1926(b) is limited to the overlap areas. The City is free to provide water service within its territorial boundaries, where the City's territory does not overlap the District's territory. Therefore, these temporal and geographic limitations establish that section 1926(b) is consistent with the Tenth Amendment. We hold that section 1926(b), as applied in the present case, does not violate the Tenth Amendment to the United States Constitution.

## V.

On cross-petition, the District conditionally raises two issues for us to review regarding whether the District is a "municipality" with the exclusive right to provide water service in the overlap areas under Colorado law. See issues 4 and 5, *supra* n. 1. Because we hold that the 1981 revenue bond is outstanding, thereby preventing the City from providing water service in the overlap areas, we need not address the issues raised by the District on cross-petition. We therefore affirm the court of appeals' decision to vacate the district court's summary judgment ruling that the City is a "municipality" under sec-

---

**26.** Article I, § 8, cl. 1, of the United States Constitution provides: "The congress shall have power ... [t]o lay and collect taxes, duties, imposts and excises; to pay the debts and provide for the common defense and general welfare of the United States; but all duties, imposts and excises shall be uniform throughout the United States."

tion 31–35–402(1)(b), 12B C.R.S. (1986), while the District is not a "municipality" under that statute. *Ute Water Conservancy Dist.*, 870 P.2d at 598–99.

## VI.

In sum, we hold that the District is entitled to the protection provided under 7 U.S.C. § 1926(b)—which prohibits the City from providing domestic water service in the overlap areas, except to those existing customers that it has historically served—until the 1981 revenue bond is discharged or reaches its maturity in 2021. We conclude that the applicable federal statutes preempt state law. We further conclude that the unambiguous language and purpose of the federal statutes, state common-law principles, and the district court's findings of fact support our conclusion that the District did not discharge the 1981 revenue bond when it reacquired the instrument in 1988; nor did the District discharge the bond when it conducted an advance refunding transaction in 1983. Because we resolve the present case in favor of the District, we need not, and do not, address the conditional issues raised by the District in its cross-petition. Accordingly, we affirm the judgment of the court of appeals.