CSL UTILITIES, INCORPORATED and CSL Community Association, Incorporated, Plaintiffs–Appellants,

v.

JENNINGS WATER, INCORPORATED, Defendant–Appellee.

No. 92–3026.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 13, 1993.

Decided December 15, 1993.

As Modified on Denial of Rehearing Feb. 25, 1994.

Donald M. Snemis, James R. Fisher (argued), Ice, Miller, Donadio & Ryan, Mark E. Bell, Indianapolis, IN, for plaintiffs-appellants.

Peter C. King (argued), Cline, King & King, Columbus, IN, for defendant-appellee.

Before CUDAHY, FLAUM, and MANION, Circuit Judges.

CUDAHY, Circuit Judge.

The plaintiff, a privately owned water utility company, seeks a declaratory judgment that its planned development of a water system does not violate the federal statutory scheme that provides for the extension of loans to certain rural water associations and protects such associations from infringement upon their services. The defendant, a rural water association indebted to the government under the loan program, contends that the plaintiff's system would encroach on the defendant's service and thus curtail it under the terms of 7 U.S.C. § 1926(b). The parties filed cross motions for summary judgment and the district court, concluding that the plaintiff's plans constituted a violation of section 1926(b), granted the defendant's motion for summary judgment and denied the plaintiff's. 807 F.Supp. 490. We reverse.

## I.

The defendant, Jennings Water, Inc., is a rural nonprofit water association in Jennings County, Indiana. It was formed in 1975 through the merger of two local rural water companies, Geneva Township Water Corporation and Muscatatuck Water Corporation, that were financed by loans from the federal Farmers Home Administration (FmHA).

Jennings assumed those loans—which in Geneva's case dated back to 1965—and in 1977 obtained another loan from the FmHA to connect and expand water treatment, storage, and distribution facilities. The term of the 1977 loan is 40 years.

The plaintiff, CSL Utilities, Inc., is a private nonprofit utility company formed in 1974 to supply water at retail to the residents of a Jennings County subdivision called Country Squire Lakes. Initially CSL was supplied wholesale water by Geneva. In 1977, when Geneva and Muscatatuck merged to create Jennings, Jennings became CSL's supplier. CSL is Jennings' major wholesale customer and has purchased water from Jennings since Jennings' inception.

In March 1987, the Indiana Utility Regulatory Commission approved a substantial rate increase—nearly 100 percent—for Jennings. In response, CSL first attempted to purchase water from neighboring North Vernon, Indiana, but the district court, see *Jennings Water, Inc. v. City of North Vernon*, 682 F.Supp. 421 (S.D.Ind.1988), and this court on appeal, see *Jennings*, 895 F.2d 311 (7th Cir. 1989), found that the arrangement would violate 7 U.S.C. § 1926(b). That provision, which is part of a federal statutory scheme to extend loans to certain associations providing water service or management or other essential community services to rural residents, prohibits encroachment on the service provided by rural water associations that hold FmHA loans.

This lawsuit involves CSL's alternative attempt to secure another water source by constructing its own water purification and delivery facility; CSL claims this addition would supplement but not eliminate its purchase of water from Jennings. CSL completed the necessary engineering studies, filed an application to build the facility, and sought a declaratory judgment that the development of the water system to serve Country Squire Lakes residents would not violate section 1926(b).

Both CSL and Jennings filed motions for summary judgment. The district court denied CSL's motion and granted Jennings' motion. While the district court and this court in the initial suit rejected CSL's ar-

rangement with North Vernon on the basis of section 1926(b)'s language prohibiting curtailment "by inclusion of the area served by [Jennings] within the boundaries of any municipal corporation or other public body," the district court in the present case held that CSL's plans constituted a violation of another part of section 1926(b), which prohibits curtailment of Jennings' service "by the granting of any private franchise for similar service within such area during the term of such loan." CSL appeals.

## II.

The statute at issue, which purports to protect the customer base of rural water associations, provides:

The service provided or made available through any such association shall not be curtailed or limited by inclusion of the area served by such association within the boundaries of any municipal corporation or other public body, or by the granting of any private franchise for similar service within such area during the term of such loan; nor shall the happening of any such event be the basis of requiring such association to secure any franchise, license, or permit as a condition to continuing to serve the area served by the association at the time of the occurrence of such event.

7 U.S.C. § 1926(b). The application of this statute to preclude a wholesale customer of an association from constructing a facility to provide its own water supply presents close and difficult questions. The private franchise restriction at issue under the statute has three components: (1) the curtailment of the association's service area (2) by a private franchise (3) that was granted during the term of the FmHA loan. On appeal, CSL contests all three of these requisites arguing, *inter alia*, that construction of its proposed water treatment and delivery facility would not curtail the "area served" by Jennings, that construction of a such a facility by an existing utility does not constitute the grant of a private franchise, and that CSL's private franchise was not granted "during the term of such loan." We address each contention separately.

*"The Area Served"*

CSL's first suit involving its arrangement with North Vernon (which we will call *Jennings I* ) established that such a deal with a municipality would be a prohibited curtailment "of the area served ... within the boundaries of any municipal corporation or other public body." 7 U.S.C. § 1926(b). The present case involves the interpretation of a different clause in section 1926(b) that prohibits curtailment "by the granting of any private franchise for similar service within such area during the term of such loan." *Id.*

Although the two clauses address similar but distinct economic concerns, they share the reference to the "area served by [Jennings]." The district court in *Jennings I* explicitly rejected CSL's argument that the Country Squire Lakes subdivision was not in Jennings' (wholesale) service area because it comprised CSL's (retail) service area. 682 F.Supp. at 424. This court affirmed the district court, noting the "uncontroverted evidence establishing that CSL was 'served' by Jennings at the time of the 1977 FmHA loan (and for the following decade)." 895 F.2d at 318.

CSL contends that the inquiry differs in the context of the "private franchise" clause of section 1926(b). The plain terms of the statute contradict that contention, however. While the "municipal corporation" clause prohibits the curtailment or limitation "of the area served by such association," the "private franchise" clause prohibits curtailment by the granting of any private franchise "within *such* area" (emphasis added). The use of the term "such" signifies that the phrase has the same meaning as it does when it is first mentioned in the "municipal corporation" clause.

CSL concedes that construction of the water treatment facility will curtail the amount of water it purchases from Jennings. Even if CSL has no desire or intent to become a permanent part of Jennings' service area or the CSL–Jennings wholesale agreement is purportedly "temporary," it is beyond dispute that CSL and the Country Squire Lakes residents are presently in Jennings' wholesale service area and are, in ad-

dition, served by Jennings for the purposes of the "private franchise" clause as well as of the "municipal corporation" clause. The issue here is not so much the scope of the service area as it is the right of a wholesale customer serving at retail to improve its own facilities to curtail or eliminate the need for wholesale supply. We address that difficult issue below.

*"During the Term of Such Loan"*

■ In this connection, the second of three prerequisites to establishing a violation of the "private franchise" clause is that the curtailment result from the granting of a private franchise. We will explore the "granting of a private franchise" in greater depth below, but temporally CSL might have been granted a franchise at its incorporation and may be given a franchise upon receiving authorization to improve its facilities. CSL originally was granted a private franchise at its incorporation in December 1974. There is a dispute whether CSL was granted this franchise "during the term of [the FmHA] loan"—the third requirement. According to CSL, its private franchise falls outside the language of section 1926(b) because it was granted before the term of the 1977 FmHA loan to Jennings and in fact before Jennings even existed. Jennings counters that its assumption of the Geneva loan predating CSL's franchise entitles it to section 1926(b)'s protection; in the alternative, or at least seemingly so, Jennings argues that the presently contemplated construction of CSL's water facility—more specifically, the state agencies' approval that is required to build and finance the water treatment facility—constitutes the granting of a private franchise that unquestionably occurred during the term of Jennings' own FmHA loan.

We turn first to the assumption issue. On October 21, 1977, after Geneva and Muscatatuck merged to create Jennings, Jennings assumed Geneva's FmHA loans, which dated back to November 1965.[1] CSL contends that it cannot possibly be poised to violate section 1926(b) when *Jennings'* 1977 loan, as opposed to Geneva's loans that Jennings assumed, was secured after CSL became a private franchise. This formalistic interpretation finds no support in the language of section 1926(b) and contravenes the statute's purposes to encourage rural water development by expanding the number of potential users and to safeguard the financial viability of rural associations and FmHA loans. *See Jennings I,* 895 F.2d at 315 (citing *City of Madison v. Bear Creek Water Ass'n, Inc.,* 816 F.2d 1057, 1059 (5th Cir.1987)). The absence of any textual reference to assumption of loans tends to support the conclusion that such a transfer does not alter the statute's scope of protection rather than CSL's view that it does. We agree with the observation of the court below that CSL fails to explain "why an agreement between the FmHA and an association to make a loan is an operative event for analyzing section 1926(b) but an agreement between the FmHA and an association to assume a loan should have no effect." Order at 8. Thus, CSL was granted a private franchise during the term of Jennings' loan from the FmHA.

*"The Granting of any Private Franchise for Similar Service"*

This brings us to what we believe is the key issue before us. Will the curtailment that is contemplated here result from the "granting of any private franchise for similar service?" If we assume that the "private franchise" involved here is the one granted at the formation of CSL in 1974, that franchise did not curtail anything at the time. In fact,

---

1. The assumption agreement provides:

The provisions of said debt and security instruments and of any outstanding agreements executed or assumed by the present debtors pertinent thereto shall, except as modified herein, remain in full force and effect, and the assuming parties hereby assume the obligations of and agree to be bound by and to comply with all covenants, agreements and conditions contained in said instruments and agreements, except as modified herein, the same as if they had executed them as of the dates thereof as principal obligors, including any obligation to pay the Government an insurance charge in addition to interest, if and as provided in any such instrument.

. . . .

This agreement shall be subject to present regulations of the Farmers Home Administration and to its future regulations which are not inconsistent with the express provisions hereof.

it brought another wholesale customer into the fold served at the time by Geneva and later by Jennings.

On the other hand, we might see the 1974 franchise grant as the basis for the presently proposed improvement of CSL's facilities so that CSL can provide most of its own raw water. It seems far-fetched, however, to attribute to the 1974 franchise grant, which originally increased the demand for water, a "curtailment" when CSL proposes to improve its own facilities. Instead we might hypothesize that CSL will be granted some new "franchise" when it receives regulatory authority to improve its own facilities. The basic question, it seems to us, is whether this grant of regulatory authority in the 1990s— which indubitably is the event producing the curtailment, if there is one—is in the words of the statute "the granting of any private franchise for similar service."

 In ordinary parlance, we would say that it is not. The "granting of any private franchise for similar service" suggests a grant to a third party (competing) supplier— not merely the granting of permission to a wholesale customer to improve its own facilities. The granting of a franchise may mean different things in different contexts, principally because the term "franchise" is not amenable to precise definition. *See* Joseph Joyce, A Treatise on Franchises § 9, at 19 (1909) ("[T]he word 'franchise' has various meanings, and it is difficult to define the term as used under constitutions and statutes, since, as a rule, it is a question of construction in each particular case precluding any definition applicable to all cases."); 36 Am.Jur.2d *Franchises* § 1, at 722 (1968) ("Many attempts have been made to define it, and there is not a little variation in the terms used."); 37 C.J.S. *Franchises* § 1a., at 142–43 (1943) ("The term 'franchise' has been used in various senses."). Generally speaking, a franchise may be defined as a privilege granted by the government to a company or individual to transact a particular kind of business, as in the case of a privilege granted to a waterworks company to supply a municipality with water and to collect water rates for the use of the water supplied. *See* Paul J. Garfield & Wallace F. Lovejoy, Public

Utility Economics 28 (1964). We think the franchise contemplated by section 1926(b) is the privilege *to serve customers.* This conclusion is suggested by, among other things, the fact that the word "franchise" is modified by the phrase "for similar service." The question is, "Similar" to what? Here we think the phrase means similar to the service provided to customers by a rural water association within its service area. The statute forbids encroachment on the water association's service area in either of two ways: (1) through expansion of a municipal or other public water system or (2) through introduction of new or expanded service by a private supplier. Thus both clauses of the statute prohibit another supplier (whether public or private) from being substituted for, and from displacing, the service of the rural water association. Now the crucial question before us is whether new or expanded service by a private supplier includes CSL's development of its own water resources to reduce or eliminate its dependence on an outside water source. We do not believe that the language of the statute taken in context reaches this extreme application. *Cf. Jennings I,* 895 F.2d at 318 n. 6 ("[S]ection 1926(b) absolutely bars any encroachment by a *competing water system* on a rural water system indebted to the FmHA.") (emphasis supplied); *Pinehurst Enter., Inc. v. Town of Southern Pines,* 690 F.Supp. 444, 452 (M.D.N.C.1988) (section 1926(b) does not prohibit municipality from providing sewage collection service in area in which FmHA-indebted association provides sewage treatment service because municipality would not be competing with FmHA-indebted association), *aff'd,* 887 F.2d 1080 (4th Cir.1989).

The cases and fragments of legislative history available to us all seem to have in mind curtailment resulting from substitution of some third party as a water-supplier for Jennings. *See Jennings I,* 895 F.2d at 315 (entity purchasing water from rural association cannot contract with municipality to replace association as its supplier of water); *Glenpool Utilities Auth. v. Creek County Rural Water Dist. No. 2,* 861 F.2d 1211, 1214 (10th Cir.1988) (municipality cannot replace rural association as supplier of water by annexing area served by the association), *cert.*

*denied,* 490 U.S. 1067, 109 S.Ct. 2068, 104 L.Ed.2d 633 (1989); *Bear Creek,* 816 F.2d at 1059 (municipality cannot substitute itself as supplier of water for area served by rural association by condemning rural association's facilities); *Moore Bayou Water Ass'n, Inc. v. Town of Jonestown,* 628 F.Supp. 1367, 1370 (N.D.Miss.1986) (same); S.Rep. No. 566, 87th Cong., 1st Sess., *reprinted in* 1961 U.S.C.C.A.N. 2243, 2309 [hereinafter Senate Report] ("[Section 1926(b) ] has been added to assist in protecting the territory served by ... [a rural water] association against competitive facilities, which might otherwise be developed with the expansion of municipal and other public bodies into an area served by the rural system."). We are aware that the statute is to be interpreted broadly, *see Jennings I,* 895 F.2d at 315 (citing Senate Report, *supra,* at 2305, 2309), but we think there is no fair implication by which it can be said to reach improvement by a wholesale customer of its own facilities so as to reduce the amount of water it must purchase at wholesale.[2] If Congress had in mind *any* authorized construction or development which would reduce demand for the rural association's water, it could easily have used language broad enough to reach that broadly defined activity.

Jennings essentially takes the position that any change in a water system, *which requires regulatory approval,* and which reduces the demand on the wholesale supplier, is prohibited by the statute. Jennings asserts that the Indiana Department of Environmental Management is required to issue permits to CSL to build the proposed reservoir and water purification facilities, *see* Ind. Code § 13–7–4–1 (1988 & 1992 Supp.), and that the Indiana Utility Regulatory Commission must issue certificates of construction to CSL authorizing the new facilities, *see* Ind. Code § 8–1–2–86 (1988). According to Jennings, the granting of these permits and certificates amounts to the "granting of a franchise."

Jennings concedes that the digging of wells by a farmer, who is an ultimate water customer (and not a reseller), would not involve the "granting of a franchise" although by using water from his own wells the farmer obviously would reduce overall demand for the rural association's water. But Jennings takes the position that similar activity involving the construction of water purification and delivery facilities by a utility that buys water at wholesale and provides retail water service would entail the granting of a franchise *if regulatory approval were required.* The requirement of approval by a public agency seems to be the *sine qua non.*

We believe this is too broad a reading of the phrase, "granting of any private franchise for similar service." As we have indicated, the grant of a "franchise," as that term is used in section 1926(b), must involve service to customers—either provision of existing service to new customers or provision of new or different service to existing customers. Here the grant to CSL of permission to build additional facilities would not confer a right to serve new customers or to provide a new or different service. The permission to CSL would be to authorize it to provide its accustomed service, but in a somewhat different fashion. Instead of buying all its water from Jennings, CSL would provide some from its own resources. There would be no change in the service received by CSL's retail customers and no new customers would be served.

Moreover, viewed from a slightly different perspective, Jennings' argument confuses the *grant* of a franchise with the exercise of a franchise. The grant of a privilege to serve customers is the grant of a franchise; serving customers by providing them with self-produced water (or water purchased at wholesale) is the exercise of a franchise. *See* Joyce, *supra,* §§ 40, 47–48. CSL was granted its franchise in 1974. Should CSL secure an environmental permit and certificates of construction, it will be able to exercise its franchise in a particular (and new) fashion—by supplying and delivering its own water. But even if CSL is unable to secure the necessary certificates and permit, it will re-

---

**2.** In general, we think that a franchise to serve at retail carries with it power to vertically integrate

to provide for a water supply.

tain its privilege to serve its customers (its "franchise") by supplying them with water purchased from Jennings.

Jennings, of course, argues that from an economic point of view it makes no difference whether CSL buys some of its water from North Vernon or supplies the same amount of water from its own wells—the demand for Jennings' water is equally reduced. But by its plain terms the statute does not apply to *any* change in CSL's water system requiring regulatory approval; it applies only to curtailments resulting from the "granting of any private franchise for similar service." If we were to construe the statute as broadly as Jennings demands, we would be precluding any development by water utilities of their own water resources as long as a government loan were outstanding to their wholesale supplier. Such an onerous restriction could freeze any self-development for many decades. Jennings' interpretation seems to us to be an extraordinary restrictive and anticompetitive reading—one that simply cannot find support in the language of the statute. No doubt the statute is intended to be broadly protectionist, but there are degrees of protectionism which its plain language does not reach.

■ It may also be argued that CSL has waived the "granting of a franchise" issue. In its reply brief, it states:

> [T]his Court must find that CSL Utilities is a private franchise. As correctly stated by Jennings, CSL Utilities admits this portion of the private franchise restriction.

Reply Br. at 4.

But in its main brief, CSL has a whole point with the heading,

> THE CONSTRUCTION OF A WATER FACILITY BY A UTILITY DOES NOT CONSTITUTE THE GRANTING OF A PRIVATE FRANCHISE.

Appellants' Br. at 14.

Of course, CSL is (or operates under) a private franchise. No one contests this. But the more relevant question is whether the granting of a franchise results in a curtail-ment of the service provided by Jennings. This issue has not been waived.

As we noted in *Jennings I*, the legislative history of the statute confirms that Congress intended section 1926(b) to be read broadly, 895 F.2d at 315 (citing Senate Report, *supra*, at 2305, 2309), and federal courts construing the statute have accordingly interpreted it liberally to protect FmHA-indebted rural water associations. 895 F.2d at 315 (citing, *inter alia*, *Glenpool*, 861 F.2d at 1214 (section 1926(b) prohibits municipality's encroachment on association's service by annexation of territory) and *Bear Creek*, 816 F.2d at 1061 (section 1926(b) forbids municipal condemnation of association facilities)). This is not to say, however, that a government loan to a rural water association can totally freeze retail water utility development within the indebted association's service area. Some development is permissible even though the granting of a franchise or the inclusion of the service area within municipal boundaries are precluded.

Section 1926(b) is, of course, aimed at suppressing competition with a supplier endowed with public funds. *See, e.g., Rural Water Dist. No. 3 v. Owasso Utilities Auth.*, 530 F.Supp. 818, 824 (N.D.Okla.1979) (section 1926(b) prohibits municipalities' exercise of their powers to sell water "when their exercise would result in competition with a Rural Water District"); Senate Report, *supra*, at 2309 (stating section 1926(b)'s purpose "to assist in protecting the territory served by such an association facility against competitive facilities"). But CSL argues persuasively that the district court's construction of section 1926(b) imposes a significant and seemingly unfair hardship upon the utility by denying it the right to develop its own facilities to service its existing customers more economically. We believe that the language of the statute, while it should be broadly construed, does not, in its present form, support what seems to be such an extreme application.[3]

---

**3.** As to CSL's contention that under the district court's interpretation, section 1926(b) violates the Takings Clause of the Fifth Amendment, we agree with the district court that the argument lacks merit.

## III.

CSL's contention that the facility's construction does not involve the granting of a private franchise during the term of the loan appears to be dispositive. We therefore REVERSE the district court's grant of Jennings' motion for summary judgment and REMAND for further proceedings.