[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 909 
 On Application for Rehearing
The opinion of May 16, 1997, is withdrawn, and the following substituted therefor.
This appeal involves a dispute between, on the one side, a public water authority, incorporated under provisions of state law, and, on the other side, the City of Wetumpka and the Water Works and Sewer Board of the City of Wetumpka. The dispute is over which entity or entities have the right to serve a newly developed subdivision, which was within the service area of the public water authority, but which was also located within the city limits of the City of Wetumpka after having been annexed by the City on August 7, 1995, before this action was filed.
The Central Elmore Water Authority ("Central Elmore"), a public water authority created under the provisions of §11-88-1 et seq., Ala. Code 1975, filed an action for injunctive relief and a declaratory judgment. In that action, it claimed that the City of Wetumpka and the Water Works and Sewer Board of the City of Wetumpka ("the Water Board") had infringed upon its territorial jurisdiction.
The trial court entered a summary judgment in favor of Central Elmore and the Elmore County Commission (which had been added as a plaintiff). The City and the Water Board appeal, raising these questions:
 (1) Did the trial court err in failing to hold that federal law, specifically the provisions of 7 U.S.C. § 1926(b), pre-empt the provisions of state law, such as the provisions of § 11-50-1.1, Ala. Code 1975, which prohibit municipalities from "acquiring, or duplicating any services of, any waterworks system or any part thereof, operated by a corporation or association which has been organized under . . . Sections 11-88-1 through 11-88-21, without the consent of a majority of the members of the governing board of said corporation or association"?
 (2) Did the trial court err in ruling that the City and the Water Board had breached a written Water Purchase Agreement between the Water Board and Central Elmore?
 (3) Did the trial court err in ruling that the City and the Water Board had breached an oral agreement between the chairman of the Water Board and Central Elmore not to lay water lines?
The evidence indicates that the Wetumpka City Council incorporated and formed the Water Board on March 21, 1949, and gave *Page 910 
the Water Board the authority to operate in "the City of Wetumpka, Alabama, and in the territory in the vicinity thereof." (Excerpt from the Articles of Incorporation of the Water Board, March 1949.)
In April 1973, the Redland Water and Fire Protection Authority was incorporated and given a specific designated jurisdiction, and in April 1974, a certificate of incorporation was issued to the Wallsboro-Santuck Water and Fire Protection Authority. The jurisdiction of the Wallsboro-Santuck Water and Fire Protection Authority included what eventually became known as the "Crutchfield property," which is the property that is the subject of this dispute. Central Elmore was created in June 1988 by the merger of the Redland Water and Fire Protection Authority and the Wallsboro-Santuck Water and Fire Protection Authority.[1]
The City of Wetumpka is a municipal corporation subject to the prohibition of § 11-50-1.1, Ala. Code 1975, and the Elmore County Commission is duly elected pursuant to the provisions of §§ 11-3-1 through 11-3-26, Ala. Code 1975. The Commission is the body legally empowered "[t]o direct, control and maintain the property of [Elmore County] as it may deem expedient according to law." § 11-3-11(a)(1), Ala. Code 1975.
The Water Board and Central Elmore entered into a Water Purchase Agreement on or about March 29, 1993, whereby Central Elmore agreed to construct and operate a water treatment facility and the Water Board agreed to purchase a guaranteed amount of the water treated at that facility. The Water Purchase Agreement provides, in part, as follows:
 "10. TERRITORIAL INTEGRITY: Nothing contained herein shall alter or modify the territorial integrity of the respective systems. Neither party shall sell water to customers from transmission lines or other facilities which might be located within the territorial jurisdiction of the other party unless it is by specific separate agreement. This restriction does not apply to any presently existing arrangements whereunder one party is providing service to customers in the other party's jurisdictional area.
 "11. PERMITS AND REGULATIONS: All parties agree to cooperate in obtaining and maintaining all necessary local, state, and federal permits and meeting all regulations [related] to operation and maintenance of water supply systems. If in the future either party should be unable, after making all reasonable efforts, to obtain any necessary permit, maintain any such permit, or meet particular regulations or requirements then, to the extent such failure prevents compliance hereunder such party shall be excused from its obligations unless and until it can reasonably obtain such permit or compliance.
 "12. BREACH AND DEFAULT PROVISIONS: Unless otherwise specifically excepted, failure of any party to meet or maintain its duties and obligations hereunder shall constitute a default and breach of agreement. In the event of any breach or default the party at fault shall be responsible for all losses, costs and expenses of the other party including lost revenues, court costs and reasonable attorney fees.
". . . .
 "17. GENERAL PROVISIONS: All matters relating to the application, and interpretation, and enforcement of this agreement shall [be] subject to a requirement of good faith and reasonableness on the part of all parties hereto. Both parties are public corporations established under statutes and/or ordinances and are managed by duly appointed boards of directors acting for the sole purpose of providing water (and in the case of Wetumpka providing sewer) service now and in the future in a financially and operationally sound manner at the lowest reasonable rate. Consequently neither party shall act in an arbitrary or unreasonable manner or take unfair advantage in any situation to the *Page 911 
detriment of the other party and/or its customers."
In December 1994, Donald Estes approached Central Elmore about the possibility of extending service to a new subdivision he intended to develop on U.S. Highway 231 North; this property is known as the Crutchfield property. It is undisputed that the Crutchfield property lies within Central Elmore's service area. Central Elmore agreed to share the cost of extending an eight-inch water main from the existing main.
Donald Estes died soon thereafter, and Earl Crutchfield was named executor of the estate of Donald Estes. Crutchfield telephoned Danny Ingram, general manager of Central Elmore, in February 1995 and asked the status of Central Elmore's plan to run a water main to the Crutchfield property. Ingram explained to Crutchfield that an agreement had been reached between Estes and the board of Central Elmore and that he was going to abide by the agreement.
Ingram sent Crutchfield an estimate of the cost of extending the water main and told him that Central Elmore could have the water main installed by October 1995. In February 1995, Crutchfield suggested to the Wetumpka City Council that he would allow the City to annex the Crutchfield property if the City would provide water service to it. Crutchfield sent Ingram a letter stating that Crutchfield had contacted the City about running the line because, Crutchfield said, Central Elmore had indicated that it would be unable to install the line by what he claimed was a May deadline. Ingram then telephoned Crutchfield and told him that he had not thought or understood that there was a May deadline and that he had operated under the assumption that they had agreed that the line was to be placed by the October date that had been given to Central Elmore by Estes. Ingram also told Crutchfield that the property was within the jurisdiction of Central Elmore Water Authority and that in his opinion the City of Wetumpka did not have authority or jurisdiction to run a water line to his property. Ingram said he then thought that Crutchfield understood the situation and understood that Central Elmore would have the water line run to his property.
In the interim, the Wetumpka City Council discussed Crutchfield's proposal and decided to act. On August 7, 1995, seventy acres of land, including the Crutchfield property, were annexed into the City. Following the annexation, the City contracted with an engineering firm to draw plans for providing water to the Crutchfield property. The City made the contract and was the one in direct contact with the contractor; the City had solicited bids by advertising in the newspaper. Ingram read the City's newspaper solicitation for bids to lay a water line to the Crutchfield property.
Joe Lambrecht, the chairman of the Central Elmore board, telephoned Bill Sahlie, who was a City Council member and the mayor pro tem., in August 1995 and informed him that Central Elmore was in the process of extending service to that particular area and that it was part of Central Elmore's jurisdiction. Sahlie was aware that Estes and Crutchfield had sought water service from Central Elmore and that Crutchfield had made an arrangement with Central Elmore to provide service to the property. A meeting was held in the Wetumpka Water Board's office and was attended by the Central Elmore board members and Ingram, as well as the Wetumpka Water Board members. Each party stated its position concerning its jurisdiction and territory. Before the line was installed, Lambrecht and Dr. Beau Dunn, a member of the Wetumpka Water Board, discussed the possibility of halting construction on the water line until the parties could resolve their differences.
In the middle of September, Ingram contacted Ms. Elizabeth Gober, the City's clerk, treasurer, and personnel officer, and asked that the City not award the contract because, he said, the territory belonged to Central Elmore. She told the Water Board of Ingram's request, but also told the Water Board that the City was planning to lay a water main to the Crutchfield property in accordance with its agreement with Crutchfield.
By October 1995, Central Elmore's water pipe for the Crutchfield property had been *Page 912 
ordered and delivered, and arrangements had been made for a contractor to begin laying the water main. After those arrangements had been made, Lambrecht learned that the City was planning to lay a water main to the Crutchfield property; upon learning that, he telephoned Dr. Dunn to suggest that neither party begin digging until the matter could be discussed. Dr. Dunn agreed to that suggestion. Lambrecht informed Ingram about the agreement he and Dr. Dunn had reached. Ingram had made arrangements with Paul East for East to lay the water line, but, in reliance upon the agreement with Dunn, he stopped East from going forward with that project until a further meeting could be held. However, a few days after Lambrecht's conversation with Dr. Dunn, and before the scheduled meeting, the City began laying its water line; it did not stop that project.
The City paid for the installation of the water line to the Crutchfield property. Dr. Dunn testified by deposition testimony that he was not aware that any money was contributed by the Water Board. Although there is no documentation of such an intent, it appears it was the City's intent to turn the water line over to the Water Board immediately after it was installed. Dr. Dunn further testified that the City and the Water Board act in concert with one another.
Central Elmore sued in the circuit court on October 17, 1995, seeking a declaratory judgment and injunctive relief against the City and the Water Board, alleging that they had wrongfully infringed upon Central Elmore's territorial jurisdiction. Central Elmore further alleged that the defendants had violated § 11-50-1.1, Ala. Code 1975, and7 U.S.C. § 1926(b). The circuit court set a hearing for October 31, 1995, on Central Elmore's request for a temporary restraining order, but that hearing was canceled at Central Elmore's request.
On November 1, 1995, Central Elmore amended its complaint by adding the Elmore County Commission as a party plaintiff. The plaintiffs filed a motion to amend the complaint, and the defendants filed a response and an objection to the motion to amend. On January 12, 1996, the court granted the motion to amend, and on February 1, 1996, the defendants answered the amended complaint and filed a counterclaim alleging that Central Elmore had breached the Water Purchase Agreement. Each side moved for a summary judgment, and on March 18, 1996, the court entered a summary judgment in favor of Central Elmore and the Elmore County Commission. This appeal followed.
 I.
The appellants, the City and the Water Board, contend that the trial court erred in failing to hold that7 U.S.C. § 1926(b)[2] preempted § 11-50-1.1, Ala. Code 1975. The Omnibus Budget Reconciliation Act ("OBRA"), Pub.L. No. 99-509, § 1001, 100 Stat. 1874 (1986) (codified at 7 U.S.C. § 1929a (1994)), directed the FmHa to sell notes and bonds in its hands without destroying the protection provided for rural water districts and their lenders pursuant to § 1926(b). By enactment of the Agricultural Credit Act of 1987 ("ACA"), Pub.L. No. 100-233, § 803, 101 Stat. 1714 (1988), § 1001 of OBRA was amended to provide that the FmHA would offer the issuer of the "note or other obligation" the right of first refusal in purchasing the note or other obligation; the ACA further stated, in subsection (g):
 "Applicability of Prohibition on Curtailment or Limitation of Service. — Section *Page 913 
306(b) of the Consolidated Farm and Rural Development Act (7 U.S.C. § 1926(b)) shall be applicable to all notes or other obligations sold or intended to be sold under this section."
As the Colorado Supreme Court held in City of Grand Junctionv. Ute Water Conservancy Dist., 900 P.2d 81 (Colo. 1995), the protection afforded by § 1926(b), which preempts contrary state law, continues to apply despite refinancing or repurchasing of the loan through a bond issue, as a result of the operation of § 803 of the ACA.
At the time of the merger to form Central Elmore, both Redland and Wallsboro-Santuck had outstanding loans with the FmHA. Although these loans were refinanced, there is no evidence that Central Elmore does not continue to enjoy the protection afforded to FmHA loan customers under 7 U.S.C. § 1926(b). The City and the Water Board assert that they have protection afforded by § 1926(b); however, this subsection was not created to afford protection to entities such as the City and the Water Board, which are either municipalities or already "within the boundaries of [a] municipal corporation." The trial court held that the statute is to protect associations from outside aggression, not to protect them in their own attempts to engage in aggression toward other public water systems. Thus, the trial court held that this statute has no application favorable to the City and the Water Board. We agree.
The evidence indicates that Central Elmore's predecessor in interest, Redland Water Authority, received a letter from the FmHA on or about March 14, 1988, notifying it of its right to participate in the Discount Purchase Program, by which FmHA's borrowers could purchase their loans at a discount. Redland responded to this offer by filling out and sending a notice that it intended to purchase its existing FmHA loan, and it submitted a good faith deposit.
The City contends that Central Elmore cannot enjoy the protection of the provisions of § 1926(b) because it never took out a loan with the FmHA, citing Scioto Co. Regional WaterDist. No. 1 v. Scioto Water, Inc., 103 F.3d 38 (6th Cir. 1996), and arguing that that decision is controlling on the interpretation of federal law. We believe that the rationale of the Colorado City of Grand Junction decision is superior to that used by the Scioto court. One court has held that a successor entity resulting from the merger of two FmHA loan holders retains the protections of the subsection. See CSLUtilities, Inc. v. Jennings Water, Inc., 16 F.3d 130 (7th Cir. 1993), cert. denied, 513 U.S. 812, 115 S.Ct. 65,130 L.Ed.2d 22, (1994), holding, with regard to a water utility's assumption of an FmHA loan, that "such a transfer does not alter the statute's scope of protection," 16 F.3d at 131.
Furthermore, the City contends that Central Elmore did not have the protection of § 1926(b) because it paid off the loan. Such an interpretation would not be consistent with the evidence, which shows conclusively that the loan from the FmHA was not satisfied and that the protection of § 1926(b) survives. The Merger Agreement shows that the debt of the predecessor systems was being "refinanced" and that the indebtedness was being "transferred" to the new system; the context reveals that retiring the debt would be accomplished by this means rather than by paying off the loan and abrogating the statutory protection. The bonds were not terminated, but the Merger Agreement states that the "Notices of Statutory Mortgage Lien" are "discharged, satisfied, and terminated." The mortgages are only security on the bonds and not the bonds themselves. Furthermore, as the trial court noted, the "Satisfaction of the Mortgage Lien" presented by the appellants does not appear to have been filed and therefore has no legal effect.
 II.
The City and the Water Board further argue that they have not violated the territorial integrity of Central Elmore as ensured by § 11-50-1.1, Ala. Code 1975, which reads as follows:
 "Municipalities are hereby prohibited from acquiring, or duplicating any services of, any waterworks system or any part thereof, operated by a corporation or association *Page 914 
which has been organized under Sections 10-4-190
through 10-4-194, Sections 11-88-1 through 11-88-21, Sections 11-88-40 through 11-88-111, or Sections 11-89-1 through 11-89-19, without the consent of a majority of the members of the governing board of said corporation or association."
It is apparent to us that the City has "acquired" and "duplicated" the "services" of Central Elmore. Central Elmore is a "corporation or association which has been organized under Sections 11-88-1 through 11-88-21."
It is undisputed that Central Elmore was already serving an area within the vicinity of the Crutchfield property. When the City paid to have the water line installed on the Crutchfield property there was already a line owned and operated by Central Elmore across the road from that property. The Water Board's own superintendent, William Allen, admitted that having a pipe on one side of the road is considered as providing service to both sides of the road. See North Shelby Water Co. v. Shelbyville Municipal Water Sewer Commission, 803 F. Supp. 15 (E.D.Ky. 1992).[3]
The City and the Water Board contend that the activities of the Water Board are not limited by § 11-50-1.1, which by its terms applies only to "municipalities," such as the City of Wetumpka, citing East Montgomery Water, Sewer Fire ProtectionAuthority v. Water Works Sanitary Sewer Bd. of the City ofMontgomery, 474 So.2d 1088 (Ala. 1985), where this Court affirmed a decision of the trial judge in which the trial judge made the statement that "the term 'municipalities' excludes a public corporation like the Plaintiff Board since it is well established that 'a public corporation organized under the Water Board Statute . . . is an entity separate and independent from the city which it serves.' " 474 So.2d at 1091. This Court has held, however, before and after the decision in the EastMontgomery Water case, that a water works board organized and operating pursuant to §§ 11-50-230 through 11-50-241 is an agency of the municipality it serves. See City of Montgomery v.Water Works Sanitary Sewer Bd. of the City of Montgomery,660 So.2d 588, 594 (Ala. 1995) ("Although the Water and Sewer Board is a corporation, it is so organized to perform its functions as an agency of the City. Accordingly, such a board is treated in the same light as the City itself."); Water Works Bd. of theTown of Parrish v. White, 281 Ala. 357, 362, 202 So.2d 721, 725
(1967) ("The supplying of water to a city and its inhabitants is a municipal function and a Water Works Board incorporated under the provisions of [§§ 11-50-230 through 11-50-241] is in that sense an agency of the city."); and Water Works Bd. ofCity of Birmingham v. Stephens, 262 Ala. 203, 209,78 So.2d 267, 272 (1955) ("The city water works board is a corporation organized by law to perform that undertaking [supplying water service] as an agency of the city."). Basically, these last three cases hold that a municipal water works board performs as an agent for the city, and the evidence in this case shows, among other things, that the City of Wetumpka laid the lines to the Crutchfield property, one witness stating that the City "made the call" to lay the lines, and the chairman of the Water Board stating that the City and the Water Board acted "in concert," a fact noted by the trial judge in his order. The trial court also noted that the City of Wetumpka appointed the Water Board members.
If we accepted the argument of the City and the Water Board that the activities of the Water Board here are not limited by § 11-50-1.1, because that section refers only to "municipalities," we would have to ignore the fact that the Legislature, in 1982, amended Chapter 50 of Title 11 of the Code, dealing with public utilities, to include the prohibition that is the subject of this action. Before the adoption of §11-50-1.1, a municipality had great powers to acquire and operate public utilities. Did the Legislature, in adopting §11-50-1.1, intend to permit municipalities to do indirectly what they could not do directly? We think not. We believe that the Legislature, in 1982, was placing a limitation on the powers that had theretofore *Page 915 
been granted to municipalities and was establishing limitations on what they could acquire and what they could duplicate. To the extent that East Montgomery Water, Sewer Fire Protection Authority v. Water Works Sanitary Sewer Bd.of City of Montgomery, 474 So.2d 1088 (Ala. 1985), conflicts with this holding, it should no longer be followed. If our interpretation of legislative intent is incorrect, the Legislature can specifically provide that water boards are not prohibited from duplicating services of other water works systems.
The Alabama League of Municipalities, as amicus curiae, argues that the trial court's judgment violates Art. I, § 22, Ala. Const. 1901, which prohibits the legislature from, among other things, passing a law "making irrevocable or exclusive grants of special privileges." Central Elmore does not contend that it has an exclusive right to its service area in the sense that no other entity may ever overlap or replace it. The legislature made provision in § 11-88-19 for another water authority, under certain circumstances, to overlap or acquire a water authority's service area; however, the legislature has not provided, as it could have, if such had been its intent, that municipalities or water works boards may encroach upon an existing water authority's service area.
 III.
The trial court held that the Water Purchase Agreement between Central Elmore and the Water Board was a valid, binding contract. Central Elmore has the power, pursuant to § 11-88-7(a)(6), Ala. Code 1975, to "make, enter into and execute such contracts, agreements, leases and other instruments and to take such other actions as may be necessary or convenient to accomplish any purpose for which the authority was organized or to exercise any power expressly granted under this section." The Water Board also has the power to make such purchases as are deemed "necessary or convenient" for the carrying out of the purposes of the Water Board. §11-50-235(4), Ala. Code 1975.
The Water Purchase Agreement was entered into in the spring of 1993. The agreement is a binding contract that prohibits either party from encroaching upon the other's territory without express permission. The terms of the agreement show the intent of the parties; the City and the Water Board have, for three years, without protest, enjoyed the benefit of Central Elmore's commitment to respect their territorial integrity and the benefit of Central Elmore's obligation under the contract to provide water.
The City and the Water Board assert that the agreement is void because, they argue, it was not properly signed on behalf of the Water Board. The Water Purchase Agreement specified that it was to be signed by the parties' "duly appointed officers." By unanimous consent of the Water Board, whether given by telephone or in person, and whether at a regular meeting or not, this contract was signed, and it has been enforced for three years. The City and the Water Board attempt to invoke the "Sunshine Law," § 13A-14-2; however, given the terms of § 11-88-21, we conclude that Central Elmore is not required to hold a public hearing as a prerequisite to entering into a transaction such as this Water Purchase Agreement. See Ex parte Alabama Public Service Commission,376 So.2d 665 (Ala. 1979); Hargett v. Franklin County Bd. ofEducation, 374 So.2d 1352 (Ala. 1979).
 IV.
The trial court held that the City and the Water Board violated an agreement between the Water Board and the chairman of Central Elmore to refrain from installing the water line until the two bodies had an opportunity to meet and possibly negotiate a compromise. When an officer of a public agency makes an agreement or gives an assurance upon which another relies to his detriment, that public agency is estopped from denying the existence of the agreement or the truth of the assurance. See Ex parte Mathers, 541 So.2d 1110
(Ala. 1989) (holding that a board was estopped from denying the truth of an assurance given by the board's chairman and an employee of the board).
In this case, Dr. Dunn, chairman of the Water Board, assured Mr. Lambrecht *Page 916 
that the Water Board would hold off installing the water line to the Crutchfield property until after the two bodies had met. In reliance on this assurance from Dr. Dunn, and based on his apparent authority to speak for the Water Board, Central Elmore delayed its plans to lay the water line to the Crutchfield property, even though it already had had the pipe delivered to the site and had only to begin digging in order to have the line installed. The City did not delay, but installed its line before the agreed meeting date. The trial court did not err in holding that the City is estopped from denying that it was bound by Dr. Dunn's assurance.
It is clear by the testimony and other evidence presented that the City and the Water Board breached the Water Purchase Agreement and the oral agreement to discontinue laying the water line to the Crutchfield property.
In conclusion, we hold that the trial court was authorized to find that the City had permitted Central Elmore to be formed and to service part of Elmore County and that the City and the Water Board cannot now encroach on Central Elmore's territory without its permission.
Based on the foregoing, the summary judgment for Central Elmore and the Elmore County Commission is due to be affirmed.
OPINION OF MAY 16, 1997, WITHDRAWN; OPINION SUBSTITUTED; APPLICATION OVERRULED; AFFIRMED.
HOOPER, C.J., and SHORES, HOUSTON, and SEE, JJ., concur.
ALMON and COOK, JJ., concur in the result.
[1] Central Elmore retains jurisdiction over a specified geographic area granted and approved by the Elmore County Commission and the probate judge of Elmore County. A concise legal description of the geographic area to be served by Central Elmore is contained in its Articles of Incorporation, filed in the Elmore County Probate Court on June 13, 1988, as amended on August 29, 1995.
[2] Pursuant to 7 U.S.C. § 1926, the Secretary of Agriculture is authorized "to make or insure loans" to "associations." The term "associations" has been defined broadly to include any entity that has received an FmHA loan. Pinehurst Enters., Inc.v. Town of Southern Pines, 690 F. Supp. 444, 452
(M.D.N.C. 1988). Subsection (b) of 7 U.S.C. § 1926 provides certain protections to such associations:
"The service provided or made available through any such association shall not be curtailed or limited by inclusion of the area served by such association within the boundaries of any municipal corporation or other public body, or by the granting of any private franchise for similar service within such area during the term of such loan; nor shall the happening of any such event be the basis of requiring such association to secure any franchise, license, or permit as a condition to continuing to serve the area served by the association at the time of the occurrence of such event."
[3] The court held that a water association having water lines running adjacent to properties had the dominant right to provide water service to the areas in question.